UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

---

| | | |
|---|---|---|
| DAVID M. SWINTON, on behalf of himself and all others similarly situated, | * * * | NO. 4:18-cv-00144 |
| Plaintiff, | | |
| v. | * | DEFENDANT SQUARETRADE, INC.'S RESPONSE TO JULY 22, 2019 ORDER REQUESTING ADDITIONAL INFORMATION |
| SQUARETRADE, INC., | * | |
| Defendant. | * | |

---

## TABLE OF CONTENTS

**Page**

I.    Distribution Of Relief To The Class ......................................................................... 1

    A.    The Number Of Sent Verses Delivered Emails Does Not Render The Method Of Distributing Relief Ineffective For Purposes Of Fed. R. Civ. P. 23(e)(2)(C). ................................................................... 1

    B.    The Number Of Sent Verses Delivered Emails Does Not Undermine The Fairness, Reasonableness And Adequacy Of The Settlement. ............................................................................................ 5

II.    SquareTrade's Methodology For Determining The Refund Settlement Class And The Situation Of Mr. Florenzano. .............................................................................. 7

    A.    SquareTrade's Methodology For Determining The Refund Settlement Class ............................................................................ 7

    B.    Mr. Florenzano's Membership In The Refund Settlement Class And Additional Investigation And Review Conducted By SquareTrade ....................................................................................... 9

III.    Relief Provided Verses Costs, Risks and Delay ................................................... 12

    A.    Relief Provided ...................................................................................... 12

    B.    Costs, Risks and Delays of Litigation .................................................. 15

IV.    Conclusion ........................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barfield v. Sho-Me Power Elec. Co-op.*,
No. 11-cv-04321-NKL, 2013 WL 3872181 (W.D. Mo. July 25, 2013) ...................................6

*Berni v. Barilla G. e R. Fratelli, S.p.A.*,
No. 16-CV-4196 (ST), 2019 WL 2341991 (E.D.N.Y. June 3, 2019) ........................................2

*Bezdek v. Vibram USA, Inc.*,
809 F.3d 78 (1st Cir. 2015) .......................................................................................5, 12

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) .............................................................................................13

*Braynina v. TJX Cos.*,
No. 15 Civ. 5897 (KPF), 2016 WL 5374134 (S.D.N.Y. Sept. 26, 2016) ...............................20

*Clayton v. McCary*,
426 F. Supp. 248 (N.D. Ohio 1976) ...............................................................................18

*Gascho v. Glob. Fitness Holdings, LLC*,
822 F.3d 269 (6th Cir. 2016) .............................................................................3, 13

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
8 F. Supp. 3d 467 (S.D.N.Y. 2014) ...............................................................................20

*Gumm v. Ford*,
No. 5:15-CV-41-MTT, 2019 WL 479506 (M.D. Ga. Jan. 17, 2019) ....................................2

*Hashw v. Dep't Stores Nat'l Bank*,
182 F. Supp. 3d 935 (D. Minn. 2016) ...............................................................................3

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Litig.*,
No. 08–1967-MD-W-ODS, 2011 WL 1790603 (W.D. Mo. May 10, 2011) ............................5

*In re Mexico Money Transfer Litig.*,
267 F.3d 743 (7th Cir. 2001) .............................................................................16

*In re Sonic Corp. Customer Data Sec. Breach Litig.*,
No. 1-17-md-2807, 2019 WL 3773737 (N.D. Ohio Aug. 12, 2019) ........................................2

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
No. 11-MD-2247 ADM/JJK, 2012 WL 13065005 (D. Minn. Jan. 19, 2012) ...........................6

*Juris v. Inamed Corp.*,
   685 F.3d 1294 (11th Cir. 2012) ...................................................................6

*Keil v. Lopez*,
   862 F.3d 685 (8th Cir. 2017) ..................................................3, 5, 12, 16

*Khoday v. Symantec Corp.*,
   No. 11-cv-180 (JRT/TNL), 2016 WL 1637039 (D. Minn. Apr. 5, 2016) ...........................2, 3

*Orlander v. Staples, Inc.*,
   802 F.3d 289 (2d Cir. 2015).........................................................13, 19, 20

*Peabody v. P.J.*,
   569 A.2d 460, 463 (Vt. 1989) ...................................................................18

*Snyder v. Watkins*,
   No. 08CA3006, 2008-Ohio-4909, 2008 WL 4376830 (Ohio Ct. App.
   Sept. 23, 2008) .......................................................................................18

*Stinson v. Delta Mgmt. Assocs., Inc.*,
   302 F.R.D. 160 (S.D. Ohio 2014) ............................................................3

*Suchanek v. Sturm Foods, Inc.*,
   No. 11-CV-565-NJR-RJD, 2018 WL 6617106 (S.D. Ill. July 3, 2018) ..................................20

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir. 2006) ...................................................................14

## Statutes and Rules

28 U.S.C.
   §1712..................................................................................................13
   §1712(b)..............................................................................................14
   §1712(e)..............................................................................................13

Fed. R. Civ. P.
   23(e) .....................................................................................................1
   23(e)(2)(C) ....................................................................................1, 2, 5

## Legislative Materials

S. Rep. No. 109-14 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3 .........................................13, 14

## Other Authorities

Bob Cohen, *Right to Private Action Under State Consumer Protection Act—
   Preconditions to Action*, 117 A.L.R.5th 155 (2004)................................................18

Defendant SquareTrade, Inc. ("SquareTrade" or "Defendant") hereby submits this response to the Court's July 22, 2019 Order requesting additional information and analysis.  ECF 106.

## I.    Distribution Of Relief To The Class

### A.    The Number Of Sent Verses Delivered Emails Does Not Render The Method Of Distributing Relief Ineffective For Purposes Of Fed. R. Civ. P. 23(e)(2)(C).

Rule 23(e) requires the Court to consider, as part of its analysis of whether a settlement proposal is fair, reasonable, and adequate, whether "the relief provided to the class is adequate, taking into account . . . the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."  Fed. R. Civ. P. 23(e)(2)(C). This section of the Rule is intended to encourage the Court to review the method of claims processing, in order to ensure that it facilitates the filing of legitimate claims and deters the filing of illegitimate claims.  *See* Fed. R. Civ. P. 23(e)(2)(c) advisory committee's note to 2018 amendment ("Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims.  A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding.").  Here, as there are *no* requirements at all imposed on class members for the receipt of settlement benefits, there is no possible concern about an "unduly demanding" claims process.  And, more broadly, the relief provided by the Settlement will be effectively distributed.

*First*, it is important to recognize that the settlement contains significant injunctive relief––including barring SquareTrade from enjoining the "channel restriction" and requiring changes to the layout of SquareTrade's Amazon selling pages—which injunctive relief takes automatic effect and is immediately and uniformly applicable.  That itself constitutes effective distribution.

*See Berni v. Barilla G. e R. Fratelli, S.p.A.*, No. 16-CV-4196 (ST), 2019 WL 2341991, at \*17 (E.D.N.Y. June 3, 2019) ("The injunction provided for in the settlement will result in changes to the packaging of Barilla's specialty pastas nationwide.  It will thus provide uniform relief to all consumers of these pastas in the class.  This constitutes effective distribution."); *Gumm v. Ford*, No. 5:15-CV-41-MTT, 2019 WL 479506, at \*6 (M.D. Ga. Jan. 17, 2019) ("Because the settlement agreement [providing injunctive relief] will apply to all [class members], the 'method of distributing relief to the class' will effectively benefit every member of the class.")

*Second*, approximately 93% of class members will receive the coupon directly via email. No class action settlement of any material size can guarantee that every class member will receive every component of the settlement benefits.  Indeed, as recognized by Rule 23(e)(2)(C) itself, many settlements require class members to take affirmative action to obtain settlement benefits, which, in practical terms, means that not all class members will receive all settlement benefits.  Yet, such settlements are routinely approved.  *See In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1-17-md-2807, 2019 WL 3773737, at \*7 (N.D. Ohio Aug. 12, 2019) (approving settlement involving claims process because "[t]he proposed claims procedure is the most effective method for distributing the benefits obtained from this settlement.").

Here, the fact that SquareTrade either did not have or no longer has a working email address for just 7% of the class does not render the method of distribution ineffective.  The situation of these class members is no different from that of class members in any number of common fund settlements involving partial direct notice, and yet such settlements are routinely approved.  For example, in *Khoday v. Symantec Corp.*, the notice program was comprised of emails and postcards that directly reached 13,133,529 class members out of 14,179,650, or approximately 92.6% and was supplemented by a publication notice program that included

publication on Facebook, an ad campaign on Google, a settlement website and a toll-free

number.  No. 11-cv-180 (JRT/TNL), 2016 WL 1637039, at *4 & n.4, 7 (D. Minn. Apr. 5, 2016).

The Court found that the settlement itself was "fair, reasonable and adequate" even though some

class members had only received publication notice and would thus be far less likely to submit a

claim than those who received direct notice.  *See also, e.g.*, *Hashw v. Dep't Stores Nat'l Bank*,

182 F. Supp. 3d 935, 946 (D. Minn. 2016) (approving settlement as fair, adequate and reasonable

where direct notice was provided to 80% of the class, additional notice was provided by

publication, and settlement benefits were distributed via a claims process); *Gascho v. Glob.*

*Fitness Holdings, LLC*, 822 F.3d 269, 274, 289-90 (6th Cir. 2016) (affirming approval of a

settlement where 90.8% percent of notices were successfully delivered to an address associated

with a class member, and benefits distributed via a claims process); *Keil v. Lopez*, 862 F.3d 685,

698 (8th Cir. 2017) (affirming a decision upholding a class action settlement as fair, reasonable,

and adequate where notice reached an estimated 87% of the class members); *Stinson v. Delta*

*Mgmt. Assocs., Inc.*, 302 F.R.D. 160, 163 (S.D. Ohio 2014) (approving class action settlement as

fair, reasonable and adequate where 7.5% of notices were returned as undeliverable).

In this case, SquareTrade provided direct notice to approximately 93% of the class via

email, a higher percentage than in each of the approved settlements cited above.  This direct

notice was supplemented by a banner advertisement campaign that ran across the Google

Display Network, the leading online network that reaches 90% of Internet users, and on

Facebook, the largest social media platform.  ECF 22-1, at 9.  This publication notice was

effective.  The digital ads were linked to the Settlement Website, and Google Analytics and other

measures indicates that, during the period of the digital advertising campaign (the "publication

notice period"), traffic to the Settlement Website was at its peak.  *See* Declaration of Jennifer

Keough ("Keough Decl.") ¶ 3.  In addition, during this period, traffic driven by the digital ads accounted for 13% of total user traffic to the Settlement Website.  Additionally, 63% of all visitors to the Settlement Website occurred during the publication notice period.  *Id*. ¶ 4.  While impressions (or ad view opportunities) were not allocated to specific demographic audiences, a total of 11,019,855 impressions were served to adults 18 years of age or older across both desktop and mobile devices, with 57% of all impressions being delivered on smartphones.  *Id*. ¶ 5.  The digital campaign's final click through rate (percentage of people who clicked on the ad and arrived at the Settlement Website) was .05%, which is considered a good result for online display ads based on 2019 data from Smart Insights.  *Id*. ¶ 6.  In addition to click throughs, digital ads also increase awareness and encourage general traffic to the Settlement Website, as indicated by the increased traffic to the Settlement Website during the publication notice period. *Id*. ¶ 6.

The Settlement Website, which is still active, contains contact information for class counsel, links to the long form notice, the settlement agreement and other important case documents, and, significantly, a link permitting class members to update their email addresses. *See* https://secure.sstsettlement.com/EmailUpdate.  In this way, a class member who did not receive email notice can nonetheless provide SquareTrade with a current email address, and thereby participate in the coupon distribution.  *Id*. ¶ 7.  During the publication notice period, 1030 requests to update email addresses were submitted, of which 22% came from class members who were not on the original email list and who therefore received notice of the settlement through publication.  *Id*. ¶ 7.

In sum, 93% of class members will receive a settlement coupon without having to take any action whatsoever, which makes the distribution of benefits in this settlement far superior to

many approved class action settlements. Class members as to which SquareTrade did not have or no longer has a working email address will benefit from the injunctive relief provided by the Settlement. Further, these class members received publication notice and had—and have—the opportunity to receive the settlement coupon by contacting the Class Administrator and updating their email address. Consequently, the benefits of the settlement will be effectively distributed for purposes of Rule 23(e)(2)(C).

**B.    The Number Of Sent Verses Delivered Emails Does Not Undermine The Fairness, Reasonableness And Adequacy Of The Settlement.**

The fact that the vast majority of the class will receive the coupon portion of the relief provided by the Settlement directly supports the fairness, reasonableness and adequacy of the settlement, because it is the best way of ensuring that the maximum number of class members receive the coupon.

Again, for purposes of the broader fairness, reasonableness and adequacy analysis, it is significant that all class members immediately benefit from the injunctive relief provided by the Settlement. That is, even a class member who does not receive a coupon via email receives a benefit. Courts consider injunctive relief as part of the analysis of whether a settlement is fair, reasonable and adequate. *See Keil*, 862 F.3d at 697 (finding settlement fair, reasonable and adequate in part because "class members . . . will benefit from the additional injunctive relief that the settlement provides."); *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Litig.*, No. 08–1967-MD-W-ODS, 2011 WL 1790603, at *3-4 (W.D. Mo. May 10, 2011) (noting the presence of injunctive relief as one factor indicating that the settlement is fair, reasonable, and adequate); *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 84 (1st Cir. 2015) ("The district court did not abuse its discretion in concluding that injunctive relief against continuation of the allegedly false advertising was 'a valuable contribution to this settlement agreement.'").

Further, as described above, class members for whom SquareTrade did not have or no longer has a working email address still received publication notice, and have the opportunity to visit the Settlement Website and provide their updated email addresses, permitting them to participate in the coupon portion of the settlement if they desire to do so. Requiring more, i.e., requiring perfect distribution of the coupon component of the relief to all class members, would be akin to requiring perfect or actual notice to all class members, which is not the standard. *See, e.g., Barfield v. Sho-Me Power Elec. Co-op.*, No. 11-cv-04321-NKL, 2013 WL 3872181, at *14 (W.D. Mo. July 25, 2013) ("the Court is only required to provide the best practicable notice to those members identifiable by reasonable effort—not achieve actual notice on every potential class member."); *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247 ADM/JJK, 2012 WL 13065005, at *5 (D. Minn. Jan. 19, 2012) ("The 'best notice practicable' does not mean actual notice, nor does it require individual mailed notice where there are no readily available records of class members' individual addresses or where it is otherwise impracticable."). *Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012) ("[c]ourts have consistently recognized that due process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprize interested parties.")

The Settlement distributes the coupon in the most effective and efficient way possible, and contains a mechanism whereby the small fraction of class members who would not otherwise receive a coupon directly are provided notice of the settlement and an opportunity to provide updated email addresses. All class members will immediately benefit from the injunctive relief. The distribution of the relief provided by the Settlement thus supports a finding that the Settlement is fair, reasonable and adequate.

II.    **SquareTrade's Methodology For Determining The Refund Settlement Class And The Situation Of Mr. Florenzano.**

A.    **SquareTrade's Methodology For Determining The Refund Settlement Class**

SquareTrade initially identified the members of the Refund Settlement Class by reviewing its claims database, identifying the "Denial Reason Codes" that it believed could have been used to demarcate claims that were denied due to the Channel Restriction, and then identifying the claims that were coded with those codes in order to identify those that were denied due to the Channel Restriction. SquareTrade explained that methodology to Plaintiff's counsel on July 12, 2018, in a memorandum entitled "SquareTrade Class Analysis." ECF 68 (Declaration of Douglas A. Winthrop ¶ 3). At the Court's request, the methodology is set out below. In addition, the memorandum is provided to the Court with this filing. *See* Declaration of Douglas A. Winthop ¶ 2, Ex. A.

SquareTrade maintains a database that stores, among other things, claim event markers for claims on which coverage under Protection Plans are denied. *See* Declaration of Cristina Saavedra ("Saavedra Decl.") ¶ 2. When SquareTrade agents deny a claim, they must select one of fourteen Denial Reason Codes to identify, broadly, why the claim is being denied. *Id*. SquareTrade reviewed all Denial Reason Codes and identified two that could cover denials based on the Channel Restriction. *See* Declaration of Bradley Snyder ("Snyder Decl.") ¶ 4. These Denial Reason Codes were "ADP Denial," which was used during a few months of the class period before being phased out, and "Not Within Terms & Conditions." *Id*. These codes are used by SquareTrade agents to identify situations in which the claim is not covered by the terms and conditions of the applicable Plan, the Plan is invalid, or there are other miscellaneous reasons for denial. *Id*. At the time SquareTrade first conducted this analysis, there were 53,668 claims that bore these Denial Reason Codes. *Id*.

In reviewing these 53,668 claims, SquareTrade looked first to a field called "Denial Reason Description" to identify instances where SquareTrade's automated claims adjudication logic determined that the claim should be denied. *Id*. ¶ 5. This was done because SquareTrade's automated claims adjudication logic uses date-based and coverage-based tests to deny claims; it is not programmed to deny a claim based on the identity of either the Plan seller or the item seller, and therefore cannot deny claims based on the Channel Restriction. *Id*. 46,184 of the 53,668 claims had a Denial Reason Description showing that the claim was auto-denied in this manner, and thus was not denied due to the Channel Restriction. *Id*.

Of the 7,484 remaining claims, 2,019 claims had a blank Denial Reason Description and 5,465 contained text notes entered by SquareTrade agents. *Id*. ¶ 6. For the 5,465 claims with notes, SquareTrade conducted a manual review of the textual notes. *Id*. This review showed that approximately 4850 claims were denied for a specified reason other than the Channel Restriction, *e.g.*, the claim was for accidental damages from handling ("ADH") when the Plan did not include ADH coverage, the item was lost, the item had a pre-existing condition, etc., and approximately 275 claims were denied due to the channel restriction, *e.g.*, "item purchased from B&H and warranty purchased from Amazon." *Id*. The remaining claims contained vague descriptions such as "invalid warranty." *Id*. SquareTrade then examined the claim denials in which the Denial Reason Description field was blank and also further examined the claims where the notes were vague. Through this process SquareTrade identified additional claims that were denied due to the Channel Restriction. *Id*. ¶ 7. Later, after the class period, SquareTrade updated this analysis and determined that there were 576 claims denied due to the Channel Restriction. *Id*. ¶ 8.

### B.    Mr. Florenzano's Membership In The Refund Settlement Class And Additional Investigation And Review Conducted By SquareTrade

Pursuant to the Court's Order, SquareTrade has investigated whether Mr. Florenzano's claim was included in the original Refund Settlement Class, and determined that it was not. Declaration of Deborah Holmgren ("Holmgren Decl.") ¶ 3.  To understand why, SquareTrade reviewed the records associated with Mr. Florenzano's situation, and determined that the agent responsible for coding Mr. Florenzano's claim mistakenly used the code "Troubleshot," rather than the "Not Within Terms and Conditions" code. *Id.*  Mr. Florezano's claim was thus not captured by the methodology employed by SquareTrade described above to identify claims in the Refund Settlement Class.

To determine if this was a one-off situation or a common coding error, SquareTrade has now manually reviewed all of the denied claims of class members that have a Denial Reason Code of "Troubleshot," of which there are 10,050. *Id.* ¶ 4.  Other than Mr. Florenzanzo's claim, fifteen additional claims out of the population of 10,051 "Troubleshot" denials were based on the Channel Restriction.  *Id.*  Consequently, SquareTrade has added these claims to the Refund Settlement Class.  *Id.*

Furthermore, in light of this discovery, SquareTrade has conducted a comprehensive review designed to identify whether any other claims or categories of claims that were not identified initially could contain Channel Restriction denials.  *Id.* ¶ 5.  This review involved the following steps:

*First*, SquareTrade reviewed claim denials for settlement class members using the remaining twelve Denial Reason Codes and, depending on the number of claim denials, either reviewed all such claim denials for Channel Restriction Denials or reviewed a random sample of

claim denials for such denials.  *Id.* ¶¶ 5-10.  The chart below, which is set out in the Holmgren

Declaration, shows the results of this review:

| Denial Reason Code | Claims Denied During Class Period | Number of Claims Sampled | Claims Denied for Channel Restriction |
|---|---|---|---|
| Troubleshot | 10,050 | 10,050 | 16 |
| Within_Manuf_Warranty | 186,039 | 1,395 | 0 |
| Wrong_Problem_Code_Selected | 55 | 55 | 0 |
| ADV_EXCH_NOT_AVAILABLE | 78 | 78 | 2 |
| AUDIT_FAILURE | 1701 | 768 | 2 |
| CLOSED_DUE_TO_INACTIVITY | 43,377 | 1,362 | 1 |
| CUSTOMER_REQUEST | 21,132 | 1,318 | 3 |
| DUPLICATE_CLAIM | 9,793 | 1,228 | 2 |
| REFERRED_TO_PARTNER | 1 | 1 | 0 |
| REPLACEMENT_NOT_AVAILABLE | 136 | 136 | 0 |
| REWORK_ADH | 139 | 139 | 0 |
| WITHIN_EXCLUSION_PERIOD | 17,581 | 1,301 | 0 |
| Blank | 8,515 | 1,205 | 0 |

In sum, with respect to denied claims coded with seven Denial Reason Codes,

SquareTrade's review of either all the claims in the category or a random sample of claims in the

category, revealed no claims denied based on the Channel Restriction.  *Id.* ¶ 6.  With respect

claims denied that were coded with five of the Denial Reason Codes, SquareTrade's review

uncovered a total of ten additional claims that were denied based on the Channel Restriction.  *Id.*

¶ 5.  SquareTrade is in the process of reviewing all remaining claim denials in each of these five

categories to identify any additional denials based on the Channel Restriction.  *Id.* ¶ 7.  All such

claim denials will be added to the Refund Settlement Class.  *Id.*

*Second*, SquareTrade reviewed the broader claims database to determine whether any

code other than a Denial Reason Code could have been used to identify a claim denied because

of a Channel Conflict.  Saavedra Decl. ¶¶ 3-8.  In this process, SquareTrade has identified a code for a "canceled warranty" and, within that set of warranties, a further code for "ineligible item." *Id.* ¶¶ 5-6.  There were 3,503 warranties purchased on Amazon during the class period that were marked with the codes "canceled warranty" and "ineligible item," and, within this group of warranties, 1,471 denied claims.  *Id.* ¶ 6.  SquareTrade has reviewed each of these claim denials and determined that the denials in 111 of them were based on the Channel Conflict.  *Id.* ¶ 6; *see also* Declaration of Sirena Ma ¶ 4.  Accordingly, SquareTrade has added these claims as well to the Refund Settlement Class.  Holmgren Decl. ¶ 9.

  *Finally*, within the set of cancelled warranties, there is also a "cancellation description" field, which is a free form field for agents or vendors to pencil in additional information regarding why they cancelled the warranty.  Saavedra Decl. ¶ 7.  To further confirm that the approach outlined above was capturing all warranties that were cancelled because of the Channel Restriction, SquareTrade ran a keyword search against all cancelled warranties (not just those coded with "ineligible item") using the three phrases that appeared most commonly in the cancellation description fields of the claims identified that were denied due to a Channel Restriction.  *Id.*  These phrases were "purchase window," "channel conflict" and "invalid."  *Id.* Each claim denied as a result of the Channel Restriction that SquareTrade identified as a result of this search had already been captured by the searches described above.  *Id.*  This validated SquareTrade's determination that "ineligible item" was the only field within the set of cancelled warranties that contained warranties cancelled because of the Channel Restriction.  *Id.*

  In sum, SquareTrade has conducted a comprehensive review of its database and systems in order to ensure that it has identified all class member claims that were denied due to the

Channel Restriction.[1]  Holmgren Decl. ¶¶ 2-11; Saavedra Decl. ¶¶ 3-8; Ma Decl. ¶¶ 2-5.

SquareTrade regrets that its initial methodology did not capture every such claim, but is

confident that, by dint of this further review, it has accurately identified claims in the Refund

Settlement Class.

## III.    Relief Provided Verses Costs, Risks and Delay

### A.    Relief Provided

In comparing the relief provided by the Settlement to the costs, risks and delays

associated with litigation, it is once again important to note that the injunctive relief constitutes

part of the "relief provided" by the entire Settlement, and that it applies to the broader class, not

just to the Refund Class members.  The injunctive relief is comprised of (1) revising the Amazon

selling page for the SquareTrade protection plans so as to move up the notice of channel

restriction, and  (2) revising the Amazon selling page for the SquareTrade protection plans to

include language describing where the customer can access a copy of the terms and conditions,

and (3) with respect to outstanding plans, not denying any claims made on the basis that the

product at issue was not purchased from Amazon.  ECF 22-1, at 10.  That these benefits are part

of the calculus of the "relief provided" has recently been confirmed by the Eighth Circuit.  *See*

*Keil*, 862 F.3d at 697; *see also Bezdek*, 809 F.3d at 84 ("The district court did not abuse its

discretion in concluding that injunctive relief against continuation of the allegedly false

advertising was 'a valuable contribution to this settlement agreement.'")

This is significant inasmuch as this injunctive relief alone would be sufficient to

compensate the class for the weak or nonexistent claims they are releasing pursuant to the

---

[1] In total, SquareTrade's review to date has resulted in the addition of 137 class member claims to the Refund Settlement Class.  The number of Refund Settlement Class members likely will be slightly lower than the number of Refund Settlement Class claims due to the fact that some Refund Settlement Class claims likely relate to the same Protection Plan and product, and SquareTrade has not yet de-duplicated the Refund Settlement Class claims.

Settlement.  In particular, with respect to a class member who might argue that he or she would not have purchased the SquareTrade Plan had she known about the Channel Restriction—the hypothetical argument referenced in the *Orlander* case referred to on page 7 of the Court's Order--that class member is made *entirely whole* by the injunctive relief.  That is, to the extent she would seek to bring a suit on the basis that she did not get what she paid for, she now has exactly what she paid for, i.e., no Channel Restriction, courtesy of the Settlement.

On top of the injunctive relief, the coupon is an additional benefit to the class.  In terms of the value of the coupon, it is best considered by its face value of $10, which equates to either a 7% or 11% discount off of the price of a one- or two-year cell phone protection plan from SquareTrade.  This value is what it is, and exists independently of the expected redemption rate, as the Supreme Court has confirmed.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480 (1980) (holding that class members' "right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel");  *see also Gascho, LLC*, 822 F.3d at 278 (same).

It is of course correct that, as the Court points out, the legislative history regarding 28 U.S.C. §1712(e)—the CAFA statute on coupon settlements—states that "the judge should consider, among other things, the real monetary value and likely utilization rate of the coupons provided by the settlement" in evaluating the fairness of a coupon settlement.  Order at 4 (citing S. Rep. No. 109-14, at 31 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 30).  But that same legislative history makes clear that "[n]ew section 28 U.S.C. 1712 is aimed at situations in which plaintiffs' lawyers negotiate settlements under which class members receive nothing but essentially valueless coupons, *while the class counsel receive substantial attorneys' fees.*"  S. Rep. No. 109-14, at 30 (emphasis added).  It further clarifies that, in coupon settlements, "the

fairness of the settlement should be seriously questioned by the reviewing court *where the attorneys' fees demand is disproportionate to the level of tangible, non-speculative benefit to the class members*." S. Rep. No. 109-14, at 32 (emphasis added). In other words, the heightened judicial scrutiny of coupon settlements, including examination of redemption rates, is based on a concern that counsel might be awarded large fees based on the total number of coupons provided when, in reality, only a portion of the coupons actually will be used by class members. *See Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006). Indeed, these kinds of high-attorneys' fees settlements are what motivated Congress to require this additional scrutiny of coupon settlements. S. Rep. No. 109-14, at *29-30. The legislative history thus both contemplates coupon settlements and affirms the appropriateness of determining fees based on other methods, such as the lodestar method, in settlements based in part on coupon relief. *Id*. at *30 ("Section 1712(b) confirms the appropriateness of determining attorneys' fees on [the amount of time class counsel reasonably expended working on the action] in connection with a settlement based in part on coupon relief.")

The concerns that motivated Congress to impose heightened scrutiny of settlements that include a coupon component are not relevant here. The modest attorneys' fees sought in connection with the relief to the broader class bare little, if any, relationship to the number or face value of the coupons that will be issued. Indeed, if just 7,500 out of the approximately 16 million coupon recipients redeem just one coupon each—a redemption rate of just .047 percent––the coupon will have delivered $75,000 worth of discounts to the class as compared to the receipt by class counsel of $25,000 in attorneys' fees. In other words, even if the Settlement were treated as *only* a coupon settlement, and even if the concerns motivating the CAFA scrutiny of coupon settlements applied here, the attorneys' fees would still be entirely reasonable.

All this being said, if the Court nonetheless wishes to forecast the redemption rate of the coupons in order to calculate the value of the coupons redeemed, a likely result is that the redemption rate will be between .5% and 3.0%.  *See* Expert Report of Lori Laybourne ("Laybourne Report") ¶¶ 18-23.  At the low end of that range, approximately 80,000 class members would avail themselves of a $10 benefit, leading to classwide benefit of $800,000.[2]  At the high end, approximately 480,000 class members would do so, resulting in a class-wide benefit of $4.8 million.  In fact, the range of benefits likely will be higher than this, because many of those Class Members purchased more than one SquareTrade Protection Plan during the Class period, and will therefore receive more than one $10 coupon.  The likely redemption range and resulting value delivered to the class highlights the reasonable nature of the attorneys' fees sought by plaintiffs' counsel with respect to these class members.  And, taken together with the value of the injunctive relief, this is easily sufficient to justify the release of hypothetical state law claims, which are likely worth zero, as discussed below.

## B.      Costs, Risks and Delays of Litigation

The Court's July 22, 2019 Order asks the parties to provide information regarding the value of hypothetical claims that could be brought under any of the state consumer protection laws.  We endeavor to do so *infra*.  However, we would also observe that the standard for whether to approve a class action settlement is not whether there could be another case in which a plaintiff theoretically could assert a claim, and the law of his or her outlier state might permit the award of some kind of relief that would be greater than the settlement benefits.  If that were the standard, no settlement in a nationwide class action could ever be approved.

---

[2] While the Settlement Agreement provides that the coupon is non-transferable, as a practical matter, SquareTrade does not intend to set up a system to verify that any particular discount is used by any particular individual. Accordingly, SquareTrade would delete that restriction when providing the discount coupon to class members. Class members could use the discount coupons they receive for themselves or pass them to others.

The Settlement here provides tangible, immediate benefits—both injunctive and via a discount—to all class members, irrespective of what state they live in. Judge Easterbrook phrased the calculus thusly in the process of affirming approval of a nationwide settlement combining injunctive relief with a coupon component: "It is best to bypass marginal theories if their presence would spoil the use of an aggregation device that on the whole is favorable to holders of small claims." *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001) (affirming approval of settlement combining injunctive relief with coupon component). The Eighth Circuit agrees, and has recently recognized that the fact that a settlement agreement does not account for differences in state laws does not render it unfair. *See Keil*, 862 F.3d at 700. The *Keil* Court found that a settlement providing for both monetary benefits and injunctive relief was fair to all class members, including those who may have had additional state-law claims, and endorsed the district court's statement that "objections that raise individual state law claims are not well taken as the Settlement is evaluated in its entirety." *Id.*

As discussed in more detail below, the state law claims are indeed "marginal" at best (*In re Mexico Money Transfer Litig.*, 267 F.3d at 747), because the vast majority of states require monetary injury to bring a consumer protection claim, and the remainder require injury in fact. *See* chart appended to Plaintiff's Brief In Response to the Court's July 22, 2019 Order (ECF 110, at 12-24) (describing the injury requirements of the consumer protection laws of the fifty states).

There are two possible claims that could be brought here:

(1)    *Claims premised on the Channel Restriction*:  To the extent the claim would involve the Channel Restriction, either seeking damages for a claim denied on that basis, or on the theory that the class member would not have purchased the Plan if he or she had been aware of the Channel Restriction, that claim would only be available to a small fraction of the class—

i.e., those who purchased a SquareTrade Protection Plan on Amazon for a product purchased elsewhere.  Such a claim would also be uncertain and subject to individualized defenses related to whether the consumer actually saw or was on notice of the Channel Restriction.  Recall that the Channel Restriction *was* disclosed; the claim in this case is that it was not disclosed in a more prominent manner.  *See* Complaint ¶ 34.

While the above describes the Channel Restriction claim that could be brought against SquareTrade, such a claim cannot be worth more than the relief provided by the Settlement because the Settlement provides complete relief for any such claim.  It compensates class members whose claims were denied on the basis of the Channel Restriction not just for the denied claim, but for the amount that they paid for the product, and it eliminates the Channel Restriction entirely on outstanding plans so that anyone who believed they were purchasing a Protection Plan with no Channel Restriction now has exactly that.  Further, the Settlement provides this relief immediately without any kind of claims process.  Given the risks attendant to any litigation, having a potential claim cannot be better than having complete relief for that claim.

(2)    *Claims premised on the arbitration clause*:  The only other basis for a hypothetical claim would be the allegation that the purchaser of the Protection Plan was not aware of the arbitration clause.[3]  As the parties have previously stated, that claim would fail in most if not all jurisdictions, because state consumer protection laws require some actual injury. This is acknowledged in the same article cited in the Court's Order, which states that "[t]he *overwhelming majority* of decided cases require the plaintiff to establish that he or she was

---

[3] As set out in the papers submitted in support of preliminary approval of the Settlement, the additional differences between the sample terms and conditions that were linked to the SquareTrade selling page on Amazon and the governing terms and conditions that were provided to class members by SquareTrade are immaterial.  *See* ECF 67 at 2-3.

injured as a precondition to asserting a private action, including in states with statutes requiring an 'ascertainable' loss."  Bob Cohen, *Right to Private Action Under State Consumer Protection Act—Preconditions to Action*, 117 A.L.R.5th 155, 155 (2004) (emphasis added).  The chart attached as an exhibit to Plaintiff's brief in response to the Court's Order of July 22, 2019 confirms this.

The cases cited in the Court's Order that purportedly involved no injury actually involve concrete injuries, if not financial ones.  In *Clayton v. McCary*, 426 F. Supp. 248, 262 (N.D. Ohio 1976), for example, the automobile sold by the defendant to the plaintiff experienced numerous problems, including a malfunctioning engine and speedometer, and the defendant had represented to the plaintiff that the automobile was in "A-Number One" condition.  *Id.* at 254, 260.  In *Peabody v. P.J.'s Auto Vill., Inc.*, 569 A.2d 460, 463 (Vt. 1989), the plaintiff was sold the front of a 1974 Saab welded to the back of a 1972 Saab, known in the trade as a 'clipped' vehicle.  *Id.* at 461. The plaintiff eventually discovered that the car was clipped and therefore not the product she had bargained for, resulting in actual injury.  *Id.* at 462.  In *Snyder v. Watkins*, No. 08CA3006, 2008-Ohio-4909, 2008 WL 4376830 (Ohio Ct. App. Sept. 23, 2008) (unpublished), the plaintiff was deprived of his vehicle's use for 175 days after he allegedly delivered the vehicle solely to obtain a repair estimate, and the defendant instead performed work to the vehicle and refused to return the vehicle until he received payment. *Id.* at *1-3.

In this case, by contrast, the argument would presumably be that the presence of the arbitration clause constitutes an injury, even though the arbitration clause only impacts the *forum* in which a dispute is resolved, not the consumers' substantive rights under the Protection Plans, and the arbitration clause would only be relevant in a future, hypothetical dispute between the customer and SquareTrade.  That is no injury, or at a minimum, it is a far more abstract injury

than those described in the cases above.  SquareTrade's counsel has not uncovered any case in which the substantive harm alleged was that the plaintiff purchased a product or service believing he or she had a right to resolve future disputes in Court, but in fact is required by the agreement with the seller to resolve such future disputes in arbitration.  This hypothetical and speculative state law claim would thus be risky inasmuch as it would be entirely unprecedented.

What is more, it would be highly individualized, because many consumers are aware of or on notice of the arbitration clause, and many consumers would attach zero value to the right to litigate versus arbitrate, or might prefer to resolve disputes in arbitration.  This case provides a perfect example of this because—as set forth in SquareTrade's motion to compel arbitration— the Plaintiff here was, in fact, on notice of the arbitration clause when he purchased the SquareTrade Plan at issue by virtue of having previously purchased numerous SquareTrade Protection Plans directly from SquareTrade, and having received the terms and conditions containing the arbitration clause in the body of an email from SquareTrade in connection with each of these purchases.  ECF 8-1, at 3-4.[4]

The court cites *Orlander v. Staples, Inc.*, 802 F.3d 289 (2d Cir. 2015), for the possibility that a plaintiff could show actionable injury by alleging that she would not have purchased her Protection Plans had she been made aware of the Plans' restrictions.  But, that allegation would be insufficient without a showing that what the consumer actually purchased was worth less that what she believed she was purchasing.  The *Orlander* Court permitted the allegation that "on

---

[4] As the Court will recall, the challenge to the arbitration clause here is based on the fact that, with purchases on SquareTrade plans *on Amazon*, the confirming email from SquareTrade contained a link to the terms of conditions that was, at least in the Second Circuit's view, not clearly demarcated.  That is not, however, how the terms and conditions were (and are) provided to customers who purchase plans directly from SquareTrade.  With such purchases, the terms and conditions, including the arbitration clause, are set out in the body of the purchase confirmation email from SquareTrade to the customer.  Because Mr. Swinton was a regular purchaser of SquareTrade Plans directly from SquareTrade, he received the terms and conditions, including the arbitration clause, on many occasions before he made the purchase on Amazon at issue in this case.

account of a materially misleading practice, [plaintiffs] purchased a product *and did not receive the full value of [their] purchase*." *Id* at 302 (emphasis added). New York courts have repeatedly rejected claims under the New York consumer fraud statute where plaintiffs fail to allege an economic injury and merely allege they would not have purchased the product in absence of the deceptive act. *See Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 481 (S.D.N.Y. 2014); *Braynina v. TJX Cos.*, No. 15 Civ. 5897 (KPF), 2016 WL 5374134, at *10 (S.D.N.Y. Sept. 26, 2016) (citing cases); *see also Suchanek v. Sturm Foods, Inc.*, No. 11-CV-565-NJR-RJD, 2018 WL 6617106, at *14 (S.D. Ill. July 3, 2018). In other words, the consumer in this case would have to show that a Plan with an arbitration clause is worth less than a Plan without one, i.e., *that he or she had been injured*. Given that the customer's substantive rights are identical in either case, the contention of injury, again, is speculative and risky.

Finally, even if one were to assume that such an arbitration claim has *some* value in *some* state, the question is what is the *value* of that claim to the class as a whole as compared to the tangible and immediate benefits provided in the Settlement. We submit that the latter is far greater than the former. Indeed, as the Court noted in the context of preliminary approval of the Settlement, Plaintiff's counsel had to make a judgment as to what they believed they could expect an Iowa jury to award to SquareTrade customers who have not suffered a whit of injury at the hands of SquareTrade and whose only complaint is that, in the future, if there were a dispute between SquareTrade and the customer over the customer's Protection Plan, a court *might* hold that the customer had agreed to arbitrate such a dispute. We believe the judgment that this claim

is of extremely limited value as compared to the benefits of the Settlement not only was and is reasonable, it is correct.[5]

Accordingly, the relief provided by the settlement is far more valuable than the claims being released, particularly in light of the risks, costs, and delay associated with litigating what would be fruitless claims.

## IV.    Conclusion

For the reasons given, SquareTrade believes that the Settlement is fair and reasonable and should be approved.

Dated: August 30, 2019                    Respectfully submitted,

By:  /s/ *Douglas A. Winthrop*

Douglas A. Winthrop*
Douglas.Winthrop@arnoldporter.com
Michael A. Berta*
Michael.Berta@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:    415.471.3100
Facsimile:    415.471.3400
*Admitted *pro hac vice*

John F. Lorentzen (AT0004867)
jfl@nyemaster.com
NYEMASTER GOODE, P.C.
700 Walnut, Suite 1600
Des Moines, IA 50309-3899
Telephone:    515.283.3100
Facsimile:    515.283.3108

Attorneys for Defendant
SQUARETRADE, INC.

---

[5] The Court's Order notes that the consumer protection laws of many states, including Iowa, award attorneys' fees to prevailing plaintiffs.  ECF 106 n.7.  That could be marginally relevant to whether a plaintiff could find an attorney to bring a longshot consumer protection claim such as this one—although any such claim would, in any case, be brought on a contingency basis in exchange for a share of the recovery or settlement—but it has no relevance to the likelihood of success or the value of the claims themselves, and is not a benefit to the class.