UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT IOWA
CENTRAL DIVISION

| | |
|---|---|
| DAVID M. SWINTON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SQUARETRADE, INC.,<br><br>Defendant. | Case No.: 4:18-CV-00144-SMR-SBJ<br><br>**OBJECTOR FLORENZANO'S RESPONSE TO THE ADDITIONAL INFORMATION BRIEFS SUBMITTED BY THE PARTIES** |

Objector David Florenzano respectfully submits this response to the submissions made by Defendant SquareTrade, Inc. ("Defendant" or "SquareTrade") and Plaintiff Swinton ("Plaintiff") on August 30, 2019.  *See* Dkt. Nos. 110, 112 (the "Additional Information Briefs").

Mr. Florenzano has four issues with the Additional Information Briefs.  *First*, Defendant and Plaintiff still have not properly compared what the vast majority of Class Members will receive in the Settlement—a coupon that is actually a discount on a single product that they cannot purchase normally—to what they are giving up:  the right to pursue any disputes with SquareTrade in court.  *Second*, the Plaintiff and Defendant have not properly responded to the Court's request for information regarding the anticipated redemption rate of the coupons likely because they know it will highlight how few Class Members would ever use the discount.  *Third*, more than a year after the Plaintiff and Defendant entered into the Settlement agreement, the small number of Class Members who will actually receive a real benefit of a refund is still undetermined.  *Fourth*, should the Court grant final approval of the Settlement over Mr. Florenzano's objection, Plaintiff's Counsel should not benefit from the substantial improvements to the Settlement that resulted from Mr. Florenzano's objection.  There are now at least 137 more

Class Members who will receive a refund, and any attorneys' fees awarded as a result of this benefit should be provided to Mr. Florenzano's counsel and not Plaintiff's Counsel.[1]

1. <u>The Plaintiff and Defendant Are Not Properly Evaluating the Nationwide Released Claims</u>

As this Court's Order dated July 22, 2019 (the "Order") correctly notes, this Court must evaluate the claims being released across the country for more than 16 million consumers, and compare those claims against the benefits achieved in the Settlement. Dkt. No. 106 at 5. The Court also correctly recognized that in situations such as these where the benefit achieved is slight to minimal—as is the case with the amorphous coupons here—then there is little risk to continuing to litigate the claims. *Id.* at 7-8.

Here, Defendant succinctly frames the issue of what is being given up for this minimal consideration: the question is whether "a Plan with an arbitration clause is worth less than a Plan without one." Dkt. 112, at 20. The answer is "of course it is."

Defendant clearly believes that the arbitration provision that it seeks to assert is a material condition to the contract. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) (including the arbitration provision in an analysis of all material terms). Not only has Defendant moved to enforce the arbitration provision in the only two federal class actions it is defending, but the Settlement Agreement specifically identifies "any challenge to the Arbitration Provision" as one of the "Released Claims." Dkt. No. 22-1, at p. 5. The applicability of the arbitration provision continues to be at the heart of this dispute.

---

[1] Mr. Florenzano waited to submit this Response because Defendant's Additional Information Brief indicated that the review of Class Member information was ongoing, and thus Mr. Florenzano anticipated an updated submission from Defendant which still has not occurred.

Plaintiff's own submission illustrates how, with an enforceable arbitration provision in place, no one would bring a claim to enforce their rights under their SquareTrade protection plan. Specifically, Plaintiff plainly states that such claims "might never be brought otherwise because of their small value. Clearly, no one is interested in pursuing such minor claims on an individual basis given that, to Plaintiff's knowledge, Defendant has never been confronted with such a claim." Dkt. No. 110 at 6. Plaintiff says "a $10 coupon is better than nothing." *Id.* at 8. However, Plaintiff's argument fails to consider that Class Members are ***worse off*** in that they are waiving their right to seek relief in a court of law in the event they do have a problem with Defendant in the future. In other words, the presence of the provision prevents any of the more than 16 million consumers from any meaningful relief in the event that SquareTrade denies paying out on its protection plan, which Defendant's own papers show they repeatedly do.[2] A contract with a mandatory arbitration provision is clearly less valuable to a consumer, and the two courts that have evaluated SquareTrade's arbitration provision found it unenforceable.[3] It is also cannot be seriously disputed that consumers do not want mandatory arbitration provisions. *See, e.g.*, Banking on Arbitration: Big Banks, Consumers, and Checking Account Dispute Resolution, Pew Charitable Trusts, at https://www.pewtrusts.org/-/media/assets/2012/11/27/pew_arbitration_report.pdf (surveying consumers and finding that

---

[2] The Defendant notes that there were at least fourteen different reasons why a claim would be denied, leading to more than 53,000 denied claims. Dkt. No. 112 at 11.

[3] Plaintiff also argues that "class members who have [not objected or opted out] are presumed to favor the settlement." *Id.* at 7. This is simply incorrect. *See, e.g.. Huyer v. Wells Fargo & Co.*, 314 F.R.D. 621, 627 (S.D. Iowa 2001) ("However, the Court recognizes that class-member silence does not always equate to support for the settlement; class members may lack the time, resources, or information necessary to lodge an objection."); *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 477 (S.D. Iowa 2001) (same).

"Almost nine in 10 consumers are concerned about the process of mandatory binding arbitration" and more than two-thirds believe that they should have a choice to go to court).

Despite the Parties' contention to the contrary, many class members have viable consumer protection claims against Defendant, even in the absence of monetary harms. As New York's highest court has long held, "a plaintiff seeking compensatory damages [under New York G.B.L. § 349] must show that the defendant engaged in a material deceptive act or practice that caused actual, ***although not necessarily pecuniary, harm***." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (1995) (emphasis added). Despite Plaintiff and Defendant's efforts to distinguish it, the Second Circuit's decision in *Orlander* is actually directly on point. *Orlander v. Staples, Inc.*, 802 F.3d 289 (2d Cir. 2015). In that case, the defendant sold a service plan for consumer electronic products, just like SquareTrade does. There, the defendant Staples argued that, under the protection plan's terms, the consumer first had to exhaust the manufacturer's warranty during the first year of coverage and Staples would not have to pay anything under its protection plan during the first year. The Second Circuit held that, notwithstanding that the consumer did not lose any substantive rights and did not have to pay more money as a result of defendant's improper practice, the protection plan was less valuable to the consumer due to the defendant's failure to properly disclose the relevant term, and therefore the plaintiff was injured under New York G.B.L. § 349. *Id.* at 301-02. The Court also rejected any suggestion that a "price premium" theory of damages was necessary to state a claim, as the statute allowed for a more liberal standard. *Id.* at 302. The situation is very similar here, where Defendant is trying to apply a provision it claims is included in the agreement that has the effect of limiting the usefulness of the contract. Neither Defendant

nor Plaintiff distinguishes the fact that there are viable G.B.L. §349 and §350 claims without monetary injury.[4]

While the Plaintiff argues that the Court is not required to consider every possible state law claim to be released under a settlement, the Court is not prevented from assessing them, particularly where the benefit from the settlement is so slight and there are other cases proceeding. As the Eighth Circuit reiterated in *Keil*, the District Court must provide "well-reasoned conclusions" to ensure that a proposed settlement is fair, reasonable, and adequate. *Keil v. Lopez*, 862 F.3d 685, 693 (8th Cir. 2017) (quoting *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988)). *Keil* specifically recognized that the settlement before it created a common fund that provided thousands of class members material compensation—up to $2,220 in cash each—which exceeded the initial settlement terms, "instead of coupons, which often are not worth their face value to the recipients." *Id.* at 696.

Both Plaintiff and Defendant also argue that the changes to the website included in the Settlement provide a benefit for all the millions of Class Members who are not receiving a refund. ***First***, the parties here sought certification of a damages class under Rule 23(b)(3), not an injunctive relief class under Rule 23(b)(2). If the parties wanted to secure injunctive relief, they should have moved to certify the Class appropriately. ***Second***, injunctive relief that focuses on disclosures for future purchasers does nothing to benefit the Class of prior purchasers. For example, if a consumer disputes SquareTrade's decision to deny a claim, she will be barred by the Settlement from bringing a suit in court, but she will also not benefit from SquareTrade moving "the Notice of Channel Restriction that presently appears on Amazon [to a position] that

---

[4] Notably, *Orlander* also found that the arbitration provision at issue did not apply because the consumers did not have proper notice of it. *Id.* at 294.

appears to a consumer without scrolling when viewed on a standard computer screen," since she already purchased the SquareTrade plan without such Notice. Settlement, Dkt. No. 22-1, p. 10. In no way, shape, or form are "class member[s] [] made *entirely whole* by the injunctive relief." Dkt. No. 112 at 13 (emphasis in original).

2.  The Parties Did Not Provide A Reasonable Response Regarding the Coupon Redemption Rate

Defendant—not Plaintiff—submitted a declaration from a marketing expert discussing her opinion about how a coupon might be used in a *marketing campaign*. This is not a reasonable estimate of the redemption rate for these "coupons" in a *settlement context*.

*First*, Ms. Laybourne bases her analysis on her experience in the marketing world, where retailers are operating within an entirely different relationship with consumers than in the settlement context. Among other things, retailers are incentivized to encourage consumers to redeem the highest number of coupons to drive traffic to, and awareness of, their store. In claims made settlements such as this, defendants are typically incentivized to minimize the claim rate, and therefore limit their expenses. *See, e.g.*, Amicus Brief of Adam J. Starke, Dkt. No. 47-1, at 15-16 (discussing the nondescript nature of the email notice). Moreover, defendants are typically loathe to publicize the fact that they have settled lawsuits alleging wrongdoing. Any redemption rate estimate based on marketing experiences would therefore be skewed higher.

*Second*, Ms. Laybourne's declaration notes that the "open rate" of an email campaign "is a principle driver of redemption rate." Dkt. No. 112-7 at ¶ 9; *see also id.* at ¶ 19 (the open rate is "a key driver of email coupon marketing performance"). However, the declaration never disclosed what Ms. Laybourne assumes the open rate for the coupon emails will be. In fact, the chart that she includes in her declaration shows how she reached her conclusions, but it skips the

open rate and goes straight to the number of people who will click on the link after they have opened the email.

This is even more surprising because the claims administrator has already sent a majority of the Class Members three emails for notice. How many Class Members opened the email is knowable by the parties, but the Court has not been told this number.

The number of people who actually read the prior email is particularly important in this situation because Mr. Florenzano never received the Notice of the Settlement, even though Defendant states that is was sent to his email address three times. It is possible that his email provider (Gmail) diverted the email to his Spam folder and it never arrived to his Inbox. Because Defendant has not provided these details regarding the success of the campaign, it is unknown how many of the other Class Members are in the same situation where Notice was not properly received.

*Third*, the calculations in Ms. Laybourne's declaration skew towards increasing the redemption rate without any basis. While the chart that she includes on page six allocates her estimate of "percentage of class members who purchased each year," there is no solid basis for how she derived these numbers. She assumes that 64% of the most-recent purchases occurred in 2018, but this is out of line with the fact that only 37% of all purchases occurred in 2018. *See* Dkt. No. 112-7 Exhibit 2 (showing 11,850,020 plans were purchased in 2018 out of a total of 31,926,265 plans purchased by the Class, or 37.17%). Placing a greater emphasis on the most recent years has the impact of increasing her calculated redemption rate because she assumes— without explanation—that there will be a 4% click-through rate for purchasers in 2018 (as

opposed to 1% for 2012 purchasers) and 40% of these 2018 consumers will redeem the coupon (as opposed to 30% for 2012 purchasers).[5]

Furthermore, it is still impossible to evaluate the value of the "coupon" the Class will receive.  As the Defendant only admitted on the eve of the Final Approval Hearing in response to Mr. Florenzano's objection (Dkt. No. 103-2), the "coupon" is not a coupon in the classic sense where the bearer has the right to receive money off from the purchase of a regular-priced product, such as the smartphone plan listed on the Defendant's website.  Smartphone Warranty, SquareTrade.com, https://www.Squaretrade.com/smartphone-warranty (offering phone protection plans at $8.99 per month) (the "Public Plan").  Instead, it now appears that the "coupon" is simply a specially-priced product that is not publicly available (the "Private Coupon Plan"); the coupon is only worth $10 because SquareTrade has priced this obscure product as $10 less than a different specially-priced product that it only makes available to friends and family, and is only seen "by accessing by a specific webpage."  Dkt. No. 103-2, ¶ 4.[6]

Aside from the fact that Class Members will have to pay substantially more out of pocket for the Private Coupon Plan than they would for one month of the Public Plan ($79 v. $8.99), the hidden nature of the Private Coupon Plan makes it impossible for consumers to comparison shop between the details of the plans.  For example, it appears that, at one point, a year-long plan had a $99 deductible before the SquareTrade plan would pay out any money to its customers.  *See, e.g.*, Smartphone Warranty, SquareTrade.com, https://www.Squaretrade.com/pp2/smartphone-

---

[5] Even Ms. Laybourne confuses the value of the coupon at stake here, misstating the undiscounted price of the protection plan.  *Id.* at ¶ 18 (stating that the one-year plan is $74 and the two-year plan is $130, instead of $89 and $149 respectively).

[6] It also appears that SquareTrade has previously offered discounts on yearly plans.  *Id.*  If so, then this lessens the impact of the coupon available here.  The most common reason to offer coupons is that a retailer expects to make more money from increased sales.  If this is just another promotional activity for SquareTrade, then only SquareTrade will truly benefit from this Settlement.

warranty ("Hidden Yearly Plan") (apparently retired web page that is not linked to from SquareTrade.com, showing yearly plan with $99 deductible). The current Public Plan has a $149 deductible. https://www.Squaretrade.com/smartphone-warranty. This is an important difference since, as the Hidden Yearly Plan page advertised, many common repairs would not meet the deductible (meaning no benefit or payment from SquareTrade) and several fall between the two price points. *See* Hidden Yearly Plan (listing repair costs below $99 (headphone jack for $69, battery failure for $79) and below $149 (speaker or microphone failures each for $130)). Therefore, there is no way to tell if the Private Coupon Plan provides the same protection as the Public Plan; indeed the coupon's benefit may be non-existent (*i.e.,* you simply pay less for a higher deductible Plan).

3.  The Expanding Refund Class Raises Additional Questions

While Defendant's submission is not clear, it appears that, as of August 30, 2019, there are at least ***137 additional*** members of the Refund Settlement Class since the Settlement was submitted to the Court for approval. This in an increase of almost 25% above the 580 individuals previously identified by Defendant.[7] The Court has no idea how many people will ultimately receive a refund because Defendant has explained that the review is ongoing. Dkt. No. 112 at 10 ("SquareTrade is in the process of reviewing all remaining claim denials in each of these five categories to identify any additional denials based on the Channel Restriction.").

Defendant did not locate the additional Refund Settlement Class Members until after Mr. Florenzano objected to the Settlement. In opposing Mr. Florenzano's objection, Defendant

---

[7] Exhibit A to the Winthrop Declaration (Dkt. No. 112-1) shows that Plaintiff's Counsel was told that there were approximately 275 Refund Settlement Class Members as of July 12, 2018 when they were negotiating the Settlement. In other words, there are now nearly three times as many members of the Refund Settlement Class as the parties thought when they agreed to these terms, showing how little investigation was conducted by Plaintiff's Counsel.

initially claimed that "[t]here is no issue with how SquareTrade has identified members of the class." Dkt. No. 103. Defendant also appeared at the Final Settlement Hearing on June 21, 2019, without taking the simple step of confirming whether or not Mr. Florenzano's name was on a list of 580 people. The only reason why Defendant has now identified more than 137 additional Refund Settlement Class Members who will receive additional funds (should the Court give grant final approval of the Settlement) was because the Court ordered them to, following Mr. Florenzano's objection. Dkt. No. 106.[8]

Similarly, Plaintiff's Counsel did nothing to ensure that the proper Class Members were identified by Defendant once they had signed the Settlement. If not for Mr. Florenzano's objection, Plaintiff's Counsel would deprive more than 130 Class Members of their right to be paid under the Settlement.

Far from providing comfort that this was a thorough exercise and that Plaintiff's Counsel was correct to simply trust that Defendant identified everyone to whom they needed to pay hundreds of thousands of dollars in the aggregate, the Additional Information Briefs show how haphazard the process was from the start. It appears that Defendant simply looked in two fields of the database in its initial review, but it turns out that at least another 137 purchasers were categorized outside of these two fields. In this process, it does not appear that Defendant asked its agents how they categorized the entries or how they handled a claim that would be subject to the Channel Restriction. Looking at the chat log attached to Mr. Florenzano's opposition, the agent ("Vincent") suggested that he could "cancel the warranty and issue the full refund" without prompting from Mr. Florenzano. Dkt. No. 99 at Exhibit C, page 20 of 23. Similarly, the next

---

[8] It also appears that, after Mr. Florenzano's objection, Defendant is now relaxing the requirement that the coupons are non-transferable and will allow Class Members to share them, which hopefully would improve the likelihood that they are used. Dkt. No. 112 at 15, n.2.

agent ("Cayzim") provided a detailed explanation of how the Amazon warranties do not cover purchases made outside of Amazon. *Id.* at p. 21 of 23. Simply applying common sense, it is uncommon for a customer service representative to issue a full refund unless they are authorized to do so. There likely is some sort of training, instructions, or prompt that suggested to the agents to offer a full refund. It seems that a good place to start in determining how SquareTrade handled warranty claims where the Channel Restriction applied is to investigate how agents are instructed to handle the situation.[9]

4.  Plaintiff's Counsel Should Not Benefit From Mr. Florenzano's Objection

Plaintiff's Counsel's fee application requested 15% of the amount paid to the Refund Settlement Class Members. Dkt. No. 90. If the same average recovery applies to these 137 additional Class Members, the monetary recovery reflected in the Settlement will increase by $84,320. *See* Dkt. No. 67 at 9. Plaintiff's Counsel do not deserve to receive any fee based on this additional recovery. Instead, this benefit for the Class was created due to Mr. Florenzano's objection, and counsel for Mr. Florenzano should receive any portion of the fee award that is based on this additional recovery, should the Court approve the Settlement over his objection. *See, e.g.*, *In re Petrobras Sec. Litig.*, No. 18-2708, 2019 U.S. App. LEXIS 27005, at *2 (2d Cir. Sep. 5, 2019) ("This Court has recognized the 'valuable and important role' of objectors, holding that objectors are 'entitled to an allowance as compensation for attorneys' fees and expenses where a proper showing has been made that the settlement was improved as a result of their effort.'" (quoting *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir. 1974))); *In re Wireless Tel. Fed.*

---

[9] Given the speed at which the agents offered to cancel the warranty, another issue worth exploring is whether some customers began filing a claim, learned that the claim would be denied, and then stopped the process. There is no assurance that these potential Refund Settlement Class Members have been identified, even though such Class Members have clearly suffered economic harm.

*Cost Recovery Fees Litig.*, Nos. MDL 1559 Master, 4:03-md-01559, 02-921-FJG, 2004 U.S. Dist. LEXIS 23343, at *10 (W.D. Mo. Apr. 20, 2004) (same); *In Re Harnischfeger Indus., Inc.*, 212 F.R.D. 400 (E.D. Wis. 2002) (same); *see Manual for Complex Litig.* § 21.643 (4th ed. 2004) ("An objector who wins changes in the settlement that benefits the class may be entitled to attorneys' fees, either under a fee-shifting statute or under the 'common fund' theory.").[10]

Dated: October 28, 2019

                                                              Respectfully submitted,

| | |
|---|---|
| **SIMPSON, JENSEN, ABELS, FISCHER & BOUSLOG, P.C.** | **SCHLAM STONE & DOLAN LLP** |
| Gary R. Fischer | Bradley J. Nash (*pro hac vice*) |
| Capital Square | Solomon N. Klein |
| 400 Locust Street, Suite 400 | 26 Broadway |
| Des Moines, Iowa 50309-2352 | New York, New York 10004 |
| Telephone: (515) 288-5000 | Telephone: (212) 344-5400 |
| | |
| **LAW OFFICES OF MARK SCHLACHET** | **WOLF POPPER LLP** |
| Mark Schlachet | By:   /s/ Matthew Insley-Pruitt |
| 3515 Severn Road |         Matthew Insley-Pruitt |
| Cleveland, Ohio 44118 | Chet B. Waldman (*pro hac vice*) |
| (216) 225-7559 | Matthew Insley-Pruitt (*pro hac vice*) |
| | Adam J. Blander |
| | 845 Third Avenue, 12th Floor |
| | New York, New York 10022 |
| | Tel.: (212) 759-4600 |

*Attorneys for David Florenzano*

---

[10] As it is Mr. Florenzano's position that the Settlement should be rejected, it would not be appropriate for his counsel to move for a fee at this time. If the Court would prefer a formal motion for fees, then counsel will certainly provide one.