IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

DAVID M. SWINTON, on behalf of himself )   Case No. 4:18-cv-00144-SMR-SBJ
and all others similarly situated, )
   )
   Plaintiff, )
   )
   v. )   ORDER ON SETTLEMENT MOTIONS
   )
SQUARETRADE, INC., )
   )
   Defendant. )

This matter is a class action lawsuit related to sales practices of Defendant SquareTrade, Inc. ("SquareTrade"). Defendant and Plaintiff David Swinton reached a tentative settlement for which Plaintiff sought preliminary approval in August 2018. *See* [ECF No. 22]. On February 14, 2019, the Court issued an Order finding it would likely be able to approve the settlement and certify a settlement class under Federal Rule of Civil Procedure 23 (the "Preliminary Approval Order"), and the Court authorized the parties to give notice of the proposed settlement to the class. *See* [ECF No. 73]. Presently before the Court are Plaintiff's Motion to Certify Class, [ECF No. 97], and Motion for Attorney's Fees and Incentive Payment, [ECF No. 90]. A fairness hearing was held on June 21, 2019. The matter is fully submitted and ready for decision. For the reasons stated herein, the motions are GRANTED.

I.    BACKGROUND

The full factual background of this matter is set out in the Preliminary Approval Order and is incorporated by reference. *See* [ECF No. 73]. On April 19, 2018, Plaintiff commenced this action as a putative class action against Defendant in the Iowa District Court for Polk County. [ECF No. 1-1]. Plaintiff sought damages and equitable relief under an unjust enrichment theory,

the Iowa Private Right of Action for Consumer Frauds Act,[1] and the Magnuson-Moss Warranty Act ("MMWA"). Defendant removed the case to this Court on May 14, 2018. [ECF No. 1].

Plaintiff alleged Defendant engaged in numerous illegal practices with respect to the marketing and sale of extended warranties, accident protection, and service plans for consumer electronics and appliances ("Protection Plans"). Defendant sells Protection Plans on its website and through other retailers, notably Amazon.com ("Amazon"). Plaintiff alleged Defendant's description on Amazon of the coverage and benefits of its Protection Plans belied the plans' severe coverage limitations, which could only be found in the plans' terms and conditions (the "Pre-Sale Terms and Conditions"). However, Defendant allegedly "designed its sales materials to make it difficult to impossible for the consumer to access [the Pre-Sale Terms and Conditions]." [ECF No. 1-1 ¶ 31]. Exacerbating matters, Plaintiff alleged the Pre-Sale Terms and Conditions differed from the final terms and conditions that Defendant sent to consumers after they purchased a Protection Plan (the "Post-Sale Terms and Conditions").

Notable among Defendant's allegedly deficient disclosures is that Protection Plans purchased on Amazon only cover products that are also purchased on Amazon (the "Channel Restriction"). Thus, if a consumer purchased a product at a physical retail store, a Protection Plan purchased on Amazon would not cover the product.

Shortly after Defendant removed the case to this Court, it filed a Motion to Compel Arbitration based on the arbitration clause found in the Post-Sale Terms and Conditions. [ECF No. 8]. Plaintiff prepared a resistance to the motion, but the parties engaged in settlement discussions before the resistance could be filed. *See* [ECF No. 11]. The Court eventually denied

---

[1] Iowa Code § 714H *et seq.*

the Motion to Compel Arbitration without prejudice after the parties reached a settlement.  [ECF No. 44].

On July 30, 2018, Adam Starke filed a Motion to Intervene in this case.  [ECF No. 18]. Starke is litigating a class action lawsuit against Defendant in the United States District Court for the Eastern District of New York, *Starke v. SquareTrade*, 1:16-CV-07036-NGG-SBJ (E.D.N.Y.). Starke's claims in that case are nearly identical to those Plaintiff asserted here.  Starke sought to intervene so that he could move the Court to transfer this matter to the Eastern District of New York. The Court ultimately denied the Motion to Intervene and declined to transfer the case.  [ECF No. 46].[2]

On August 9, 2018, Plaintiff submitted a proposed class action settlement for the Court's approval (the "Settlement Agreement" or "Settlement").  The Settlement would apply to a class consisting of

> all persons or entities in the United States or its territories who, during the period from April 20, 2012 through October 8, 2018, (the "Class Period"), purchased a SquareTrade Protection Plan on Amazon, but excluding the undersigned and her immediate family, any entities in which Defendant has a controlling interest or which have a controlling interest in Defendant, and the officers, directors, employees, affiliates, and attorneys for Defendant (the "Settlement Class").

[ECF No. 73 at 32].[3]  Individuals within the Settlement Class will hereafter be referred to as "Class Members."

Under the terms of the Settlement, Defendant agrees to: (1) make certain changes to Amazon webpages offering its Protection Plans; (2) provide refunds ("Settlement Refunds") in an

---

[2] However, the Court allowed Starke to file an amicus brief resisting the parties' proposed settlement.

[3] The defined terms within the quoted text shall have the same meanings in this Order.

amount equal to the purchase price of the product underlying the Protection Plan (the "Covered Product") to Class Members whose Protection Plan claims were denied because of the Channel Restriction (the "Refund Class Members");[4] (3) honor Class Members' claims under Protection Plans purchased within the Class Period that would otherwise be denied because of the Channel Restriction; and (4) provide a $10 coupon to all Class Members for use on a Protection Plan for a mobile phone (the "Settlement Coupon"). *See* [ECF No. 22-1 at 10–13]. As discussed below, the Settlement Agreement contemplates that up to fifteen percent of the Settlement Refunds will be paid to lead class counsel as part of their award of attorney's fees in this matter. *Id.* at 11. Thus, Settlement Refunds will be the respective purchase price of each Class Member's Covered Product, less up to fifteen percent thereof.

Defendant's original settlement proposal would have offered a $5 coupon to Class Members, but Defendant agreed during settlement negotiations to increase the face value of the coupon to $10. [ECF No. 68 ¶¶ 2–3]. The Settlement Coupon applies only to flat-rate, one-or two-year mobile phone Protection Plans that are generally not available to the public (the "Coupon Plans"). [ECF No. 103-2 ¶¶ 4–5]. After applying the Settlement Coupons, the one-year Coupon Plan costs $79, and the two-year Coupon Plan costs $139. *Id.* ¶ 5. The Coupon Plans appear to have a deductible of at least $25. *Id.* at 8. The Settlement Coupons may not be applied to purchases made prior to the coupons' issuance. [ECF No. 22-1 at 13]. They may be combined with other SquareTrade promotions, but not with other Settlement Coupons. *Id.* The coupons have no cash value, are not transferable, and expire one year from the date they are issued. *Id.* However, Defendant does not intend to set up a system to allow it to enforce the

---

[4] If Defendant cannot determine the purchase price of a Covered Product, the Settlement Refund in such a case will be the highest amount available under the Refund Class Member's Protection Plan. [ECF No. 22-1 at 11].

coupons' non-transferability and thus plans to delete that restriction when distributing the coupons to Class Members.  [ECF No. 112 at 19 n.2].

As to changes to Defendant's Amazon webpages, Defendant agreed to move its notice of the Channel Restriction.  [ECF No. 22-1 at 10].  That notice will now "appear[] to a consumer without scrolling when viewed on a standard computer screen at 100% font size."  *Id.*  Defendant also agreed to include language, also accessible without scrolling, that describes where a consumer can access a copy of the Pre-Sale Terms and Conditions.  *Id.*  These changes were completed in September 2017.  [ECF No. 75 at 1].

In addition, the parties have agreed Plaintiff's counsel, if approved as class counsel, will seek an award of attorney's fees as follows: (1) Defendant will pay up to $25,000 of class counsel's fees, expenses, and costs; and (2) class counsel may recover up to fifteen percent of each Settlement Refund (the "Percentage Payment").  [ECF No. 22-1 at 13–14].  The Percentage Payment will be deducted directly from the Settlement Refunds.  Plaintiff's counsel, Harley Erbe and Steven Wandro, seek appointment as class counsel.  *See id.* at 19.[5]  The parties have also agreed Plaintiff will seek an incentive award of $2,500, to be paid by Defendant.  [ECF No. 22-1 at 14]

---

[5] Federal Rule of Civil Procedure 23(g)(1) provides that "a court that certifies a class must appoint counsel."  Until a class is certified, a court "may designate interim counsel to act on behalf of a putative class," Fed. R. Civ. P. 23(g)(3), but this is not required, *see Leeb v. Charter Commc'ns, Inc.*, 2019 WL 1472587, at *1 (E.D. Mo. Apr. 3, 2019) ("While not statutorily required, the appointment of interim class counsel may be helpful in 'clarify[ing] responsibility for protecting the interests of the class during precertification activities . . . .'" (alteration in original) (citation omitted)).  The Court did not appoint interim class counsel in this case, but Plaintiff's counsel effectively served in that capacity.  Notably, they responded on behalf of the Settlement Class to the Court's various requests for additional information, and they were the point of contact for Class Members during the Settlement notice period.

To identify Refund Class Members, Defendant searched a database that stores, among other things, claim event markers for claims on which coverage under a Protection Plan is denied. [ECF No. 112 at 11]. This database assigns codes to denied claims that broadly identify why the claim was denied ("Denial Reason Codes"). *Id.* Of the fifteen Denial Reason Codes,[6] Defendant determined two of them applied when claims were denied due to the Channel Restriction—"ADP Denial" and "Not Within Terms and Conditions." *Id.* After reviewing claims bearing those Denial Reason Codes, Defendant determined there were approximately 580 Refund Class Members, and the average purchase price of their Covered Products was approximately $620. [ECF No. 69 ¶ 12]. Therefore, class counsel stand to be awarded approximately $78,940 (the sum of $25,000 and the Percentage Payment).

Class Members do not have to take any action to obtain recovery under the Settlement. Settlement Coupons will automatically be distributed by the third-party claims administrator (the "Administrator") via email. [ECF No. 22-1 at 13]. Defendant will automatically mail to Refund Class Members checks for their Settlement Refunds. Defendant has provided the Administrator with Class Members' last-known email addresses based on Defendant's business records. *See id.* at 13. Additionally, to confirm the mailing addresses of Refund Class Members, the Administrator will send each Refund Class Member an email asking them to confirm their mailing address. For Refund Class Members who do not respond to that email, the Administrator will send up to two more address-confirmation emails. For Refund Class Members who do not respond to any of these emails, the Administrator will confirm their mailing address through the National Change of Address Database ("NCAD").

---

[6] For the purposes of this Order, the Court treats the absence of a Denial Reason Code (i.e., where the Denial Reason Code field was left blank) to be its own Denial Reason Code.

The Court issued the Preliminary Approval Order on February 14, 2019. [ECF No. 73]. The Court found it would likely be able to approve the Settlement and certify the Settlement Class. The Court also authorized the parties to give the Settlement Class notice of the Settlement. The parties then executed their notice plan. The plan included running a digital campaign to advertise the Settlement; establishing a settlement website (the "Settlement Website") that contained, among other things, a detailed notice of the Settlement; and distributing email notice of the Settlement to Class Members. [ECF No. 97-2 ¶ 4]. Three copies of the email notice were sent to each of the roughly 16.8 million Class Members, but the notice was successfully delivered to only 15.7 million of them. [ECF No. 97-2 ¶¶ 5–6]. However, during the period over which the digital advertising campaign ran (the "Publication Notice Period"), said campaign was successful in driving traffic to the Settlement Website. *See* [ECF No. 112-5 ¶ 3]. The Settlement Website contains a link that allows Class Members to update their email addresses. *Id.* ¶ 7. During the Publication Notice Period, Class Members submitted 1,030 requests to update their email addresses. *Id.* Approximately 230 of these requests came from Class Members who do not appear to have received email notice of the Settlement. *Id.*

Class Members were given an opportunity to object to the Settlement or opt out of the Settlement Class. Plaintiff's counsel forwarded to the Court twenty-six written objections. Roughly 4,000 individuals have opted out of the Settlement Class. *See* [ECF No. 97-2 ¶ 14]. If the Court approves the Settlement, any Class Members who did not timely exclude themselves from the class will be bound by the Court's judgment in this case. *See* [ECF No. 73 at 37]. In exchange for the various actions Defendant has agreed to take, Class Members who remain in the class will release any claims against Defendant arising from or relating to: (1) the present action, including any challenge to the arbitration provision in the Post-Sale Terms and Conditions; and (2) "any

marketing, advertising, promotion, representation, and/or sale by the Defendant associated with any SquareTrade Protection Plan on Amazon during the Class Period." [ECF No. 22-1. at 5].

On June 21, 2019, the Court held a fairness hearing on the Settlement. At the hearing, objector David Florenzano appeared through counsel. One of Florenzano's objections concerned his claim that he did not receive email notice of the Settlement, even though he had a Protection Plain claim denied due to the Channel Restriction. After the hearing, the Court ordered the parties to address various issues relevant to the fairness, adequacy, and reasonableness of the Settlement. These issues included the respective values of Settlement Coupons and state-law claims surrendered under the Settlement; whether Defendant had identified Florenzano as a Refund Class Member; and whether the notice plan and method of distributing relief were adequate in light of the roughly one million Class Members who did not receive email notice of the Settlement. [ECF No. 106]. The parties timely responded to the Court's request. [ECF Nos. 110; 112; 115]. Defendant's response explained its efforts to further search its claims data for additional Refund Class Members. Those efforts are described in more detail below, but it is sufficient here to note Defendant identified roughly 120 additional Refund Class Members through that process. *See generally* [ECF No. 115 at 2].

The Court will discuss additional facts as they become relevant.

## II.    ANALYSIS

### A.  *Approval of the Settlement*

#### 1.    Legal Standard

Federal Rule of Civil Procedure 23(e)(2) sets out the circumstances in which a court may authorize a class action settlement that would "bind class members." A court may only approve such a settlement "after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A court must not substitute "[its] own judgment as to optimal settlement

terms for the judgment of the litigants and their counsel." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148–49 (8th Cir. 1999). Still, "[u]nder [Rule 23(e)], the district court acts as a fiduciary, serving as a guardian of the rights of absent class members." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005). "The court's role in reviewing a negotiated class settlement is . . . 'to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned.'" *Marshall v. Nat'l Football League*, 787 F.3d 502, 509 (8th Cir. 2015) (citation omitted).

When determining whether a settlement is fair, reasonable, and adequate, a court must consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The requirement that a settlement be fair, reasonable, and adequate is rooted in federal case law. As the Advisory Committee observed, "[c]ourts have generated lists of factors to shed light on this concern." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment ("Rule 23 Advisory Committee Notes"). In the Eighth Circuit, courts have

traditionally focused on four factors when analyzing the fairness, reasonableness, and adequacy of a proposed settlement: (1) "the merits of the plaintiff's case, weighed against the terms of the settlement"; (2) "the defendant's financial condition"; (3) "the complexity and expense of further litigation"; and (4) "the amount of opposition to the settlement" (the "*Van Horn* Factors"). *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988). The United States Court of Appeals for the Eighth Circuit has held that the first of these four factors is the "most important consideration in deciding whether a settlement is fair, reasonable, and adequate." *In re Wireless*, 396 F.3d at 933.

The specific considerations in Rule 23(e)(2)(A)–(D) were added as part of amendments to the Federal Rules of Civil Procedure that went into effect in December 2018. However, they were not intended to displace the various factors that courts have developed in assessing the fairness of a settlement. "The goal of this amendment is not to displace any factor [developed by federal courts], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Rule 23 Advisory Committee Notes. It is thus appropriate for the Court to consider the Rule 23(e)(2) factors along with the *Van Horn* Factors.

In addition, because the Settlement includes coupons as compensation, it is subject to increased scrutiny. The Class Action Fairness Act ("CAFA") "requires more 'heightened judicial scrutiny of coupon-based settlements' than settlements resulting in cash payments." *Galloway v. Kan. City Landsmen, LLC*, No. 4:11-1020-CV-W-DGK, 2013 WL 3336636, at *2 (W.D. Mo. July 2, 2013) (quoting *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006)) (hereafter, "*Galloway II*"). Specifically, 28 U.S.C. § 1712(e) states, "[i]n a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written

finding that, the settlement is fair, reasonable, and adequate for class members."  Rule 23(e) and

§ 1712(e) "require the court to determine whether the value of the 'coupon settlement is reasonable

in relation to the value of the claims surrendered.'"  *Galloway II*, 2013 WL 3336636, at *2 (quoting

*Sobel v. Hertz Corp.*, No. 3:06-CV-0545-LRH-RAM, 2011 WL 2559565, at *10 (D. Nev.

June 27, 2011)).

2.  Rule 23(e)(2) factors

a.      Adequacy of the relief provided for the class

i.      The costs, risks, and delay of trial and appeal

Given the facts of this case and objections to the Settlement, the Court will take the

Rule 23(e)(2) factors out of order and first consider the adequacy of the proposed relief to the class.

The Court must consider this relief against "the costs, risks, and delay of trial and appeal."  Fed. R.

Civ. P. 23(e)(2)(C)(i).  This factor is closely intertwined with the considerations necessary under

CAFA, and so the Court will also apply in this section the heightened scrutiny under § 1712(e).

Further, the Court's analysis of this factor will necessarily include analysis of two related

*Van Horn* Factors: "the merits of the plaintiff's case, weighed against the terms of the settlement"

and "the complexity and expense of further litigation."  *Van Horn*, 840 F.2d at 607.

As discussed above, the relief to the class can be categorized as: (1) payments to Refund

Class Members in an amount equal to the purchase price of their Covered Products, less up to

fifteen percent for attorney's fees; (2) injunctive relief in the form of changes to Defendant's

Amazon storefront and Defendant's agreement not to enforce the Channel Restriction for any

Protection Plans purchased within the Class Period; and (3) a Settlement Coupon for all

Class Members.  In exchange for these various forms of relief, Class Members release Defendant

from claims arising or relating to: (1) this action, including any challenge to the arbitration

provision in the Post-Sale Terms and Conditions; and (2) "any marketing, advertising, promotion,

representation, and/or sale by the Defendant associated with any SquareTrade Protection Plan on Amazon during the Class Period." [ECF No. 22-1 at 5].

The Court made various findings in the Preliminary Approval Order that remain true and do not warrant detailed repetition here. The Court remains of the belief that the Settlement's terms regarding the Channel Restriction—both the Settlement Refunds and Defendant's honoring claims subject to the restriction—are exceedingly fair. In effect, Class Members who would benefit from this relief are made whole. If Class Members' claims were denied due to the Channel Restriction, they will receive refunds for the purchase price of their Covered Products. Future claims that would otherwise be denied due to the Channel Restriction will now be honored. For Class Members who expected their Protection Plans to apply to items not purchased on Amazon, the plans now function in accordance with that expectation. Simply put, such Class Members are getting the benefit of their bargain.

Additionally, the Court remains satisfied with the changes Defendant made to its Amazon storefront. As a general matter, injunctive relief is properly considered as part of a court's analysis of whether a settlement is fair, reasonable, and adequate. *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 974 n.6, 978 (8th Cir. 2018) (finding that injunctive relief in the form of data security measures "has value to all class members," and the district court properly considered non-monetary relief when weighing the merits of the plaintiff's case against the terms of the settlement); *see Keil v. Lopez*, 862 F.3d 685, 697 (8th Cir. 2017) (finding settlement to be fair, reasonable, and adequate in part because "class members . . . will benefit from the additional injunctive relief that the settlement provides"); *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 84 (1st Cir. 2015) ("The district court did not abuse its discretion in concluding that injunctive relief against continuation of the allegedly false advertising was 'a valuable contribution to this

settlement agreement.'"); *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, No. 08–1967-MD-W-ODS, 2011 WL 1790603, at *3-4 (W.D. Mo. May 10, 2011) (noting the presence of injunctive relief as one factor indicating the settlement was fair, reasonable, and adequate).  This is true even if the settlement class is certified under Rule 23(b)(3)—typically a damages class—rather than Rule 23(b)(2), which applies to claims for declaratory or injunctive relief.  *See* Fed. R. Civ. P. 23(b)(2), (b)(3); *In re Bisphenol-A*, 2011 WL 1790603, at *3–4, *7 (considering injunctive relief in the fairness, reasonableness, and adequacy analysis and thereafter certifying the class under Rule 23(b)(3)).  Moreover, injunctive relief can benefit a class even if it is merely prospective.  *In re Target Corp.*, 892 F.3d at 972, 974 n.6 (noting that security measures implemented after a security breach had already compromised class members' payment card information "has value to all class members"); *Keil*, 862 F.3d at 691, 697 (noting that changes to the way the defendant represents the contents of its pet food products would benefit class members who continue to purchase pet food).

As stated in the Preliminary Approval Order, the Channel Restriction is clearly described, prominently placed, and can generally be viewed on a computer without scrolling.  Within the same paragraph as the Channel Restriction, customers are informed that, by purchasing a Protection Plan, they agree to the plan's terms and conditions.  A web address to the terms and conditions is provided, and customers are informed that the terms and conditions will be emailed to them after purchase.  Additionally, Defendant now includes the entirety of the terms and conditions in the body of the post-sale email it sends to its customers, rather than providing only a link to the terms and conditions in that email.  *See* [ECF No. 69 ¶ 3].  These changes help to ensue the Channel Restriction and terms and conditions are not obscured from SquareTrade customers, and the changes will benefit the class going forward.

The Court's consideration of the Settlement Coupons is less straightforward. The Settlement Coupons consist of a one-time, $10 discount off the purchase of either a one-year or a two-year Protection Plan for a mobile phone. After applying the discount, the Coupon Plans will cost $79 for the one-year plan, and $139 for the two-year plan. The Settlement Coupon thus represents a roughly eleven-percent discount off of a one-year plan, and a seven-percent discount off of a two-year plan. The Coupon Plans are not normally available to the public, and they are also generally less expensive than the plans publicly available on SquareTrade's website or Amazon. *See* [ECF No. 103-2 ¶¶ 4–7]; Smartphone Warranty, SquareTrade, Inc., https://www.squaretrade.com/smartphone-warranty (last visited Apr. 14, 2020) (showing a smartphone protection plan for a single phone starting at $8.99 *per month*). However, the plans appear to have a deductible of at least $25, thus creating additional expenses that Class Members must incur before enjoying the benefits of a Coupon Plan.

By their terms, the Settlement Coupons are a limited form of relief. They may only be redeemed for purchases of the Coupon Plans from Defendant's website. [ECF No. 22-1 at 13]. The coupons may not be applied to purchases made prior to the issuance of the coupons. They may be combined with other SquareTrade promotions, but not with other Settlement Coupons. The coupons have no cash value and expire one year from the date they are issued.

As noted above, § 1712(e) states that a court can only approve a settlement that would award coupons to class members if it determines the settlement is fair, reasonable, and adequate. 28 U.S.C. § 1712(e). Like with Rule 23(e) generally, this is a relative inquiry that "require[s] the court to explicitly determine whether the value of the 'coupon settlement is reasonable in relation to the value of the claims surrendered.'" *Galloway II*, 2013 WL 3336636, at *6 (citation omitted). "Although the parties need not provide a precise monetary value for a settlement, they should

sufficiently develop the record so an approximate value can be established." *Id.* "Otherwise, the Court will have no rational, independent basis for determining whether the settlement is fair, reasonable, or adequate." *Id.* To determine the value of a coupon settlement, a court should consider, among other things, "the real monetary value and likely utilization rate of the coupons provided by the settlement." S. Rep. No. 109-14, at 31 (2005); *Galloway II*, 2013 WL 3336636, at *6 (citation omitted). "The face value of a coupon cannot be used to establish its monetary value because the monetary value of a coupon is always less than its face value." *Galloway II*, 2013 WL 3336636, at *6 (citing *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001); *True v. Am. Honda Motor Co.*, 749 F.Supp.2d 1052, 1073 (C.D. Cal. 2010)). When evaluating the fairness, reasonableness, and adequacy of a coupon settlement, a court should also consider whether the proposed award of attorney's fees is excessive relative to the value of the settlement. *See* S. Rep. No. 109-14, at 32 ("[T]he fairness of the settlement should be seriously questioned by the reviewing court where the attorneys' fees demand is disproportionate to the level of tangible, non-speculative benefit to the class members.").[7]

The parties have made no serious effort to quantify the value of the Settlement Coupons. Defendant argues, without further explanation, that the value of each coupon "is best considered by its face value of $10." [ECF No. 112 at 17]. Generally, that would not be true. Even though the coupons here are transferrable (and thus could be sold), no rational consumer would pay $10

_____

[7] Defendant suggests CAFA's coupon-settlement provision is aimed solely at settlements requesting disproportionate attorney's fees and has no application in the absence of such a request. *See* S. Rep. No. 109-14 at 30 ("New section 28 U.S.C. § 1712 is aimed at situations in which plaintiffs' lawyers negotiate settlements under which class members receive nothing but essentially valueless coupons, while the class counsel receive substantial attorneys' fees."). Although CAFA's legislative history suggests the award of attorney's fees is potentially one relevant factor in assessing a coupon settlement, Defendant's broader suggestion conflicts with the plain language of § 1712(e), which calls for heightened scrutiny of any settlement, such as the one before the Court, "under which class members would be awarded coupons." 28 U.S.C. § 1712(e).

for a coupon that would allow him or her to save $10.  Such a transaction is pointless for the individual buying the coupon.

The lack of a quantified value for the Settlement Coupons is not necessarily fatal to the Settlement.  After all, the parties need not provide a precise monetary value for the coupons.  Instead, they must provide enough information to allow the Court to perform its ultimate responsibility under § 1712(e): to determine if the settlement is fair, reasonable, and adequate in light of the claims surrendered.  *Galloway II*, 2013 WL 3336636, at *6.  To this end, at least one court has considered qualitative factors when weighing a settlement coupon's value.  *See In re Bisphenol-A*, 2011 WL 1790603, at *4.  Factors that show greater value include an independent cash value, transferability, the ability to use the coupons on a wide variety of products, and low barriers to redeeming the coupons.  *See id.*  Factors that show less value include a lack of cash value, a lack of transferability or no secondary market, applicability to only a small number of products, that class members will need to expend additional funds to use the coupons, and the presence of various restrictions on the coupons' use.  *See id.* at 4; *Galloway v. Kans. City Landsmen, LLC*, No. 4:11-1020-CV-W-DGK, 2012 WL 4862833, at *6 (W.D. Mo. Oct. 12, 2012) ("*Galloway I*").

Defendant submitted an expert report from Lori Laybourne Pawasittichot on the value and likely redemption rate of the Settlement Coupons.[8]  The report focused largely on the coupons' redemption rate.  Pawasittichot identified numerous factors that impact the potential redemption rate of the coupons: (1) the rate at which emails transmitting the coupons are opened; (2) the

---

[8] Pawasittichot has fifteen years of experience issuing and analyzing a large variety of email coupon campaigns in the retail sector in the United States across both luxury and mass market segments.  [ECF No. 112-7 ¶ 2].  She has worked on email coupon campaigns for companies such as Saks Fifth Avenue, Estee Lauder Companies, the Gymboree Group, and StubHub. *Id.* ¶¶ 3–7.

click-through rate (i.e. the number of users that access the links in the email); (3) whether the recipients are prior and/or repeat customers of the company issuing the coupon; (4) relevance of the coupon; (5) value of the coupon; (6) price of the underlying product; (7) the ease of redemption; and (8) the behavior of the coupons' audience (e.g., mass market audiences tend to be less engaged than luxury market audiences).  *See* [ECF No. 112-7 ¶¶ 9–17].

Based on these factors, Pawasittichot estimated the redemption rate of the Settlement Coupons would range from .5% to 3%.  *Id.* ¶ 19.  In her view, various factors suggested a higher redemption rate: most Class Members purchased their Protection Plans within the last two years; 38% are repeat SquareTrade customers; Class Members have received three emails notifying them of the Settlement (and thus the Settlement Coupon); and there is a relatively low barrier to redemption in that Class Members will not need to take any action to receive the coupons. *Id.*  She also believed other factors were neutral or made redemption less likely.  She noted the Settlement Coupon was not targeted by relevance in any way ("*i.e.*, there is no information regarding whether the recipients have recently purchased a phone"), she assumed the audience was a mass market audience, and she believed the cost of the product (here, the Coupon Plans) were significant.  *Id.* ¶ 20.  She did, however, believe the significant cost of the Coupon Plans was offset by the Settlement Coupons' percentage discount off the price of those plans.  *Id.*

Pawasittichot did not provide a precise value of the Settlement Coupons, but she highlighted certain elements that factored into what she saw as their significant value.  First, she believed that because the coupons offered discounts of either seven or thirteen percent (depending on the Coupon Plan purchased), their value was significant.  *Id.*[9]  She also believed the coupons

---

[9] Pawasittichot understood the Coupon Plans to cost $74 or $130 for a one-year or two-year plan, respectively.  [ECF No. 112-7 ¶ 18].  These figures are not correct, but her discount

had intrinsic value because SquareTrade has not previously disseminated coupons like the Settlement Coupons. *Id.* ¶ 23. She also believed the transferability of the coupons gave them more value. *Id.* Finally, she believed the estimated redemption rate signaled the value of the coupons. "That is, if the coupons had no or only trivial value, then the redemption rate would be much lower, and would approach zero, which is not the case here." *Id.*

The Court largely agrees with Pawasittichot's analysis of the Settlement Coupons' value, but the Court has greater concerns than she did about certain factors detracting from their value. Prominently, Class Members must purchase a Coupon Plan to use a Settlement Coupon. Thus, they must pay at least $79 to enjoy this benefit of the Settlement. This is a boon to Defendant, which stands to benefit financially from Class Members' redemption of the Settlement Coupons.[10] Pawasittichot's analysis does not mention the deductible applicable to the Coupon Plans, but the deductible adds further costs to the use of this benefit, and thus makes the Settlement Coupon less valuable. Furthermore, the coupon is limited to a Protection Plan for a mobile phone, even though Defendant offers Protection Plans for a wide variety of consumer electronics. It remains unclear how many of the Protection Plans at issue in this case covered a mobile phone. Additionally, the coupons cannot be redeemed for cash.

However, the coupons do have some indicia of value. Notably, there are no blackout dates, the coupons have a reasonable expiration date of one year, and they can be combined with other SquareTrade promotions (although not with another Settlement Coupon). Also, there are no

---

percentages are close enough to the coupons' actual discount percentages that the Court does not find this error undermines her analysis or otherwise calls it into question.

[10] As the Court noted in a previous Order, if every Class Member used the Settlement Coupon to purchase a one-year Coupon Plan, it would generate roughly $1.343 billion in sales for Defendant. [ECF No. 106 at 5].

discernable barriers to their redemption.  Class Members will automatically receive an email that will allow them to redeem the coupon and/or purchase a discounted Coupon Plan.  They need not opt in or take other affirmative steps to receive a Settlement Coupon.

Furthermore, although a rational individual would not normally pay $10 to acquire a Settlement Coupon, that typically simple analysis is complicated here because the coupons serve a gatekeeping function.  The coupons apply only to the Coupon Plans, which are flat-rate plans not normally available to the public.  The plans are also generally less expensive than the plans publicly available on SquareTrade's website or Amazon.  The amount of savings depends on the monthly Protection Plan that would otherwise be purchased, but the savings usually exceed $10.  *See* [ECF No. 103-2 ¶ 7].  Thus, it is conceivable that someone might be willing to pay $10 (or more) to purchase a Class Member's Settlement Coupon in order to have access to the Coupon Plans.

There is no evidence indicating the size or nature of this secondary market for the coupons.  In fairness to the parties, given that this type of coupon is unprecedented for SquareTrade, it is not clear there would be any non-speculative evidence on this issue.  The Court does not agree with Defendant that each Settlement Coupon is worth its $10 face value.  At the same time, considering the coupons' various qualitative elements, the Court finds the coupons are not worthless.  They are likely not worth much, but it goes too far to say they have no value.

As for the Settlement Coupons' redemption rate, the Court finds Pawasittichot's estimate of the redemption rate to be both reasonable and reliable.  The factors that she used to calculate the redemption rate bear a rational relationship to redemption tendency, and it is clear that she weighed factors that support both higher and lower redemption rates.  Furthermore, the Court agrees with Pawasittichot's observation that "predicting email coupon redemption rates is difficult

to do with precision." [ECF No. 112-7 ¶ 22]. The Court also supports her approach to present a range within which the redemption rate is likely to fall, rather than unduly speculate as to a more precise figure.

However, redemption rates falling within Pawasittichot's range of .5% to 3% are potentially low relative to other email coupon marketing campaigns. Pawasittichot's report cited two white papers that referenced email coupon redemption rates. A white paper from 2009 noted that "recent studies indicate that online coupon redemption rates tend to fall anywhere between 5 percent and 20 percent." Experian Mktg. Servs., *The Coupon Report: Benchmark Data & Analysis for E-mail Marketers* 1 (2009), http://www.experian.com/assets/marketing-services/white-papers/EMS_coupon_report_WP.pdf (last visited Apr. 14, 2020). A more recent white paper noted that redemption rates for email coupons delivered through desktop channels is around 2.7%, and coupons delivered via email accessed through a mobile device (as opposed to a computer) were redeemed at a rate of 2% to 4%. Alex Brown, *Study Shows ROI for Mobile Coupon Redemption*, PointOfSale.com (Apr. 13, 2015), https://pointofsale.com/study-shows-roi-for-mobile-coupon-redemption/ (last visited Apr. 14, 2020). A redemption rate of only .5% would fall well below those figures, but a redemption rate of 3% would be largely in line with typical redemption rates in email coupon campaigns. The Court finds the potential range of redemption rates reinforces the conclusion that the Settlement Coupons are of limited value.

But under CAFA, the Court does not consider the value and redemption rate of the Settlement Coupons in a vacuum. The Court must weigh those factors against the claims that Class Members will relinquish by virtue of the Settlement. Class Members who are not Refund Class Members—that is, Class Members who did not have a claim denied because of the Channel Restriction—likely have no claim under the MMWA. Even if such Class Members could

make a colorable argument that they have suffered harm in the amount of the difference between what they paid for their Protection Plans versus what those plans are actually worth—a sort of "benefit of the bargain" theory of injury—such injuries alone are generally not actionable under the MMWA. Instead, plaintiffs must typically show there was a breach of the warranty in question. *See Temple v. Fleetwood Enters., Inc.*, 133 F. App'x 254, 268 (6th Cir. 2005) ("Ultimately, the applicability of the [MMWA] is directly dependent upon a sustainable claim for breach of warranty.").

For example, in *Moroz v. Alexico Corp.*, the district court observed that most courts have interpreted the MMWA's civil action provision "as allowing a claim under the MMWA only to redress a breach of warranty that causes the Plaintiff to sustain actual damages." No. 07-3188, 2008 WL 109090, at *5 (E.D. Pa. Jan. 8, 2008). The court found the plaintiff failed to show he suffered damages caused by the defendant's failure to adequately disclose the disputed warranty terms, where the only damage plaintiff suffered was that he paid more for the underlying product than he would have if the warranty had been properly disclosed. *See id.* at *6.

The surrendered claims in this case, however, go beyond the Class Members' potential MMWA claims and include any claim arising from this action and "any marketing, advertising, promotion, representation, and/or sale by the Defendant associated with any SquareTrade Protection Plan on Amazon during the Class Period." [ECF No. 22-1. at 5]. As objectors pointed out, and which the Court raised with the parties, this broad relinquishment of claims includes potential claims under state consumer fraud statutes. Generally, these laws "prohibit[] deceptive or unfair acts and practices in the marketplace." Bob Cohen, Annotation, *Right to Private Action Under State Consumer Protection Act—Preconditions to Action*, 117 A.L.R.5th 155 (2004).

But the obstacles to non-Refund Class Members bringing such claims are similar to those facing their MMWA claims.  To succeed on a consumer fraud claim, most states require the plaintiff to show actual damages, ascertainable harm, pecuniary loss, or the like.  *See* [ECF No. 110 at 12–24] (table showing the injury requirements under states' consumer fraud statutes); Cohen, *supra*.  ("The overwhelming majority of decided cases require the plaintiff to establish that he or she was injured as a precondition to asserting a private action, including in states with statutes requiring an 'ascertainable' loss.").  Without a denied Protection Plan claim, it will be difficult for non-Refund Class Members to meet such requirements.

Moreover, under a "benefit of the bargain" theory of injury, a non-Refund Class Member would likely struggle to prove how much the inadequate disclosure of particular contract terms affected the value of his or her Protection Plan.  Even then, the most such a claim would be worth is the price of the Protection Plan.  And that maximum amount only applies if the defective disclosures rendered the Protection Plan valueless, which seems highly unlikely.  Some states' consumer fraud statutes allow for the recovery of statutory damages.  *See, e.g.*, N.Y. Gen. Bus. Law § 349(h) (providing for $50 per violation in statutory damages separate from actual damages). So, some non-Refund Class Members may stand to recover such damages in a lawsuit.

But recovery is no certain matter—non-Refund Class Members would have to litigate their claims, which is a time-consuming, expensive, and arduous process.  And although adequately showing injury is normally necessary to succeed in a state consumer fraud case, it is not sufficient. Other challenges remain.  For example, some states require plaintiffs to show reliance on the defendant's deceptive statement or omission.  *See* Cohen, *supra*, §§ 10[a], 10[c].  Even in states that do not require reliance, a plaintiff must still establish the deceptive practice caused his or her injury.  *See id.* § 10[c].  Most state consumer fraud statutes allow for the award of attorney's fees

to prevailing plaintiffs.  *See* Debra Pogrund Stark & Jessica M. Choplin, *Does Fraud Pay? An Empirical Analysis of Attorney's Fees Provisions in Consumer Fraud Statutes*, 56 Clev. St. L. Rev. 483, 497 (2008) (noting that, as of 2008, the consumer fraud laws of forty-five states "provide for the awarding of attorney's fees to a prevailing plaintiff, either as a mandate to the court or at the discretion of the court").  This somewhat mitigates the litigation risk of pursuing such claims, but a plaintiff must *succeed* to win attorney's fees.  Even if a plaintiff does succeed, those fees are compensation for the plaintiff's lawyers, not the plaintiff, and their award does nothing to change the duration of such lawsuits or the obstacles to success therein.

All of this is to say that, although the value of the Settlement Coupons may be low, so is the value of the claims surrendered.  Furthermore, given the time involved and potential expenses (such as attorney's fees if a plaintiff cannot secure representation on a contingency fee basis), it is unlikely that any non-Refund Class Member would pursue them in an individual lawsuit.

Non-Refund Class Members would not necessarily fare better proceeding in this action on a class-wide basis.  As the Court explained in its Preliminary Approval Order, this matter will likely take years to resolve, assuming it makes it to trial.  Although all of this is subject to the parties' litigation strategies, the matter is likely to include a motion to compel arbitration, a pre-answer motion to dismiss, protracted discovery, class certification, and summary judgment. There may be interlocutory appeals on some of those issues.  The case would then proceed to trial and possibly appeal.  In addition to these delays and expenses, the risks of proceeding to trial are substantial.  Notably, the Court is skeptical the proposed class could be certified for trial.  There are numerous individual issues that would appear to cause intractable management problems, ranging from the state-by-state analysis of the enforceability of the arbitration clause, to whether causation can be established on a class-wide basis.  Even if the parties agreed to a settlement at a

later stage in the litigation, there is no guarantee such a settlement would be more favorable to the Settlement Class than the one presently before the Court.

Although the Court has focused thus far on non-Refund Class Members, the analysis is similar for Refund Class Members. Their non-MMWA claims are subject to the same potential reliance and causation obstacles as those of the non-Refund Class Members. And although their MMWA claims may be more colorable, there are also genuine questions as to whether the MMWA even applies to Defendant's Protection Plans. *See* [ECF No. 67 at 7–8]. Refund Class Members also face the same litigation risks as non-Refund Class Members, whether in this action or individual actions. Against these uncertainties, the Settlement will give Refund Class Members precisely what they lost when their Protection Plan claims were denied due to the Channel Restriction—compensation for the item they paid to have insured. There does not appear to be a rational reason for Refund Class Members to prefer litigating this case over accepting the Settlement.

Objectors Justin Hagan and David Florenzano ascribe theoretical value to the absence of an enforceable arbitration clause applicable to the Protection Plans. They argue Class Members are giving up a substantial benefit by entering into the Settlement and surrendering their right to challenge the arbitration clause in the Post-Sale Terms and Conditions. This argument is premised on the decision of the United States Court of Appeals for the Second Circuit in *Starke*, 913 F.3d 279 (2d Cir. 2019), upholding the district court's finding that the arbitration clause in the Post-Sale Terms and Conditions was unenforceable under New York law, *see id.* at 288 (noting that "arbitration remains a creature of contract" and "the parties agree that New York contract law applies"). Hagan argues the Second Circuit's *Starke* decision is a "game-changer" in that it removes a "major inhibitor to viable consumer class cases." [ECF No. 93 at 3]. This overstates

the scope of the *Starke* ruling.  The decision was based on New York law, which will not apply to the vast majority of the Settlement Class and, in any event, is not binding on this Court.  Perhaps the contractual analysis under the law of other states will produce similar results to that in *Starke*, but that is far from certain.

Moreover, that is but one procedural hurdle the Settlement Class will need to overcome if it continues litigating this case.  And it is not clear how the absence of an enforceable arbitration clause will actually benefit the class.  It makes the merits of Class Members' claims no more or less colorable, and any assessment of how the lack of mandatory arbitration might influence a different settlement in this or any other case is unduly speculative.  Florenzano argues the ability to challenge a denied Protection Plan claim in court is worth more than a $10 Settlement Coupon. The Court is not persuaded by this argument.  It unjustifiably assumes all Class Members will be able to avoid application of the arbitration clause in the Post-Sale Terms and Conditions, based on findings from two courts applying a single state's law (i.e., decisions of the district court and court of appeals in *Starke*).  It also ignores the fact that a lawsuit over the denial of a Protection Plan claim involves damages of such little value that it would likely never be worth the cost and time of litigation, regardless of the forum.  Tellingly, neither Hagan nor Florenzano try to ascribe a specific value to the absence of an arbitration clause.  But like with any claims based on a "benefit of the bargain theory," the absence of an arbitration clause cannot be worth more than the price a Class Member paid for his or her Protection Plan.  Thus, even if everyone in the class could proceed to trial, they generally will not be able to recover more than that price (in addition to, possibly, statutory damages).  If Class Members think as highly as Hagan and Florenzano do about their prospects of litigating legally dubious claims just because some Class Members might not be compelled to arbitration, they could have opted out of the Settlement.

Finally, the Court notes the proposed award of attorney's fees in this case does not raise the concerns over disproportionate attorney's fees expressed in CAFA's legislative history. Plaintiff's attorneys seek an award of $25,000, plus up to fifteen percent of any Settlement Refunds. At the time Plaintiff submitted his application for attorney's fees, his counsel sought a total maximum award of $78,940. Even if the Settlement Coupons have no value, that award is still only roughly twenty-two percent of the monetary benefit in the Settlement (based on the original 580 Refund Class Members). As noted in the Court's Preliminary Approval Order, that percentage is well within the acceptable range of fee awards derived from payments to class members. *Cf. Yarrington v. Solvay Pharms., Inc.*, 697 F. Supp. 2d 1057, 1064 (D. Minn. 2010) (observing that courts in the Eighth Circuit "have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in class actions").

The Court understands the arguments by various objectors that the Settlement Coupons are of little value. But for most Class Members, so, too, are the claims surrendered. The redemption rate of the coupons is also potentially low, but it is largely in line with their value. The Court must consider the Settlement as a whole. *Marshall*, 787 F.3d at 509. Here, that means weighing the Refund Payments, the Settlement Coupons, and the injunctive relief against the Class Members' surrendered claims and the substantial risks in pursuing them. The Court finds the balance of these factors weighs in favor of the Settlement. Accordingly, for the purposes of § 1712(e), the Court finds the Settlement is fair, reasonable, and adequate.

Furthermore, based on the analysis in this section, the Court also finds the costs, risks, and delay of trial supports a finding that the relief in the Settlement is adequate under Rule 23(e)(2)(C)(i). Additionally, based on that same analysis, the Court finds the "merits of the plaintiff's case, weighed against the terms of the settlement" and "the complexity and

expense of further litigation" under *Van Horn* weigh in favor of finding the Settlement to be fair, reasonable, and adequate.

ii.      Proposed method of distributing relief

The Court will next consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). On the facts of this case, the analysis is twofold. First, the Court will consider, per the language of the rule, the method of distributing relief to the class. Second, the Court will consider whether Defendant has adequately identified Refund Class Members, a necessary predicate to effectively distributing relief to them.

Regarding the method of distributing relief, there is no claims process in this case. Defendant has already implemented the injunctive relief under the Settlement, and Settlement Coupons and Settlement Refunds will automatically be transmitted to eligible Class Members. The Administrator will distribute Settlement Coupons to Class Members via email. Defendant provided the Administrator with Class Members' email addresses based on its business records. Before Defendant transmits Settlement Refunds, the Administrator will send up to three emails to each Refund Class Member asking them to confirm their mailing address. For Refund Class Members who do not respond to those emails, the Administrator will use the NCAD to confirm their mailing address.

Defendant's business is completely electronic. Class Members purchased their Protection Plans on Amazon and therefore interacted with Amazon, and Defendant, via email. The Protection Plans are virtual products, the terms and conditions of which were transmitted to Class Members via email. There is no requirement that a mailing address be provided when purchasing a Protection Plan on Amazon. Defendant is thus more likely to have an accurate email address for a customer than it is to have a physical mailing address. Consequently, it is reasonable

for the parties to rely on Class Members' email addresses when distributing notice and relief under the Settlement. Reliance on email, however, brings with it predictable complications. The Administrator submitted an affidavit stating she sent notice of the Settlement to 16.8 million email addresses. However, the email notice was successfully delivered to only 15.7 million Class Members. This means roughly 1.1 million Class Members did not receive email notice of the Settlement and may not receive a Settlement Coupon. Furthermore, Florenzano claims not to have received email notice of the Settlement. In his most recent filing to the Court, he speculates that all three copies of the email notice were routed to his spam folder. [ECF No. 113 at 7].

Rule 23 expressly allows for notice of a class action to be sent by "electronic means." Fed. R. Civ. P. 23(c)(2)(B). This language was added in the 2018 Amendments to the Federal Rules. The Advisory Committee explained:

> Subdivision (c)(2) is also amended to recognize contemporary methods of giving notice to class members. . . . [T]echnological change since 1974 has introduced other means of communication [other than first class mail] that may sometimes provide a reliable additional or alternative method for giving notice. . . . [C]ourts should consider the capacity and limits of current technology, including class members' likely access to technology.

Rule 23 Advisory Committee Notes.

It is unlikely the Advisory Committee was not aware of spam filtering or the risk that notice might bounce back from no-longer-active email addresses. Such occurrences do not render notice defective *per se*, and courts routinely find notice is sufficient even when it does not reach every class member. *See Keil*, 862 F.3d at 698 (affirming a decision upholding a class action settlement as fair, reasonable, and adequate where notice reached an estimated 87% of the class members); *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 274, 289-90 (6th Cir. 2016) (affirming approval of a settlement where 90.8% percent of notices were successfully delivered to an address associated with a class member, and benefits were distributed via a claims process); *Hashw v.*

*Dep't Stores Nat'l Bank*, 182 F. Supp. 3d 935, 946 (D. Minn. 2016) (approving settlement as fair, adequate and reasonable where direct notice was provided to 80% of the class, additional notice was provided by publication, and settlement benefits were distributed via a claims process). As the Advisory Committee's comments recognize, the Court's responsibility is to weigh any weaknesses in the notice plan as part of a broader inquiry into its effectiveness.

Although Rule 23(c)(2)(B) concerns notice and not necessarily the distribution of relief, in this case the two are so related that the rule and the Advisory Committee's comments are instructive. The Administrator is using the same email addresses to send relief as it did to send the email notice. Thus, for Class Members who did not receive or see email notice of the Settlement, they will likely not receive or see an email regarding distribution of the Settlement Coupon.[11]

In light of this risk, giving notice and distributing relief via email alone would likely be ineffective under Rule 23. But the parties supplemented email notice with a banner advertisement campaign that ran across the Google Display Network and on Facebook. [ECF No. 22-1 at 9]. This publication notice appears to have been effective. The digital ads were linked to the Settlement Website, and Google Analytics and other measures indicate that, during the Publication Notice Period, traffic to the Settlement Website was at its peak. *See* [ECF No. 112-5 ¶ 3].

The Settlement Website, which is still active, contains contact information for Class Counsel, links to various case documents and, significantly, a link permitting Class Members to update their email addresses. *Id.* ¶ 7. Thus, a Class Member who did not receive

---

[11] This concern is less pressing for Refund Class Members. If they do not respond to the Administrator's email asking them to confirm their mailing address, the Administrator will try to confirm their mailing address through NCAD. The Court finds this step ensures the effectiveness of distributing Settlement Refunds, but Refund Class Members are still potentially subject to not receiving email distribution of the Settlement Coupon.

email notice had an opportunity to provide a current email address and thereby participate in the Settlement Coupon distribution. Class Members appear to have done so. During the Publication Notice Period, 1,030 Class Members submitted requests to update their email addresses. *Id.* As part of this process, Class Members had to provide their "previous email address." *Id.* Of the 1,030 email-update requests submitted, 229 of the previous email addresses (twenty-two percent) were not on the list of emails Defendant provided to the Administrator. *Id.* This suggests those 229 Class Members learned about the Settlement by means other than the email notice.

In sum, although email distribution of relief in this case may miss certain Class Members, the parties took satisfactory steps through the Settlement Website and banner advertising campaign to give Class Members notice and alternative means to ensure they receive distributed relief. In light of the electronic nature of Defendant's business and these additional steps to notify Class Members of the Settlement, the Court finds the method of distributing relief supports a finding that the relief is adequate.

The Court next turns to the effectiveness of Defendant's method for identifying Refund Class Members. As noted above, this inquiry is relevant to the effectiveness of the method for distributing relief because identifying Refund Class Members is a prerequisite to distributing Settlement Refunds to them. Defendant originally identified roughly 580 Refund Class Members. To do so, Defendant reviewed its claims database and identified the Denial Reason Codes it believed were associated with denials due to the Channel Restriction. Of the fifteen possible Denial Reason Codes, Defendant determined two codes—"ADP Denial" and "Not Within Terms and Conditions"—could cover such denials. This is because they are used by SquareTrade agents to identify situations in which a claim is not covered by the terms and conditions of the

applicable Protection Plan, the plan is invalid, or there are other miscellaneous reasons for denial. Defendant reviewed the 53,688 claims bearing these Denial Reason Codes and determined roughly 580 claims were denied due to the Channel Restriction.

Florenzano objected to the Settlement. In relevant part, he claimed he purchased a television directly from the manufacturer and insured it via a Protection Plan that he purchased from Amazon. [ECF No. 99 at 2]. The television, which cost approximately $3,800, subsequently broke, and he reported it to Defendant. *Id* at 2, 17. A transcript of his discussion with SquareTrade representatives unambiguously shows he was told his claim could not be accepted because of the Channel Restriction. *See id.* at 20 ("Actually Amazon warranties are only for items purchased through Amazon. . . . The warranty you purchased is not eligible."). Florenzano was offered and accepted a refund of the Protection Plan premium ($238.18). *See id.* at 14–15, 22.

Florenzano claimed he did not receive email notice of the Settlement, implying he was not identified as a Class Member. The Administrator's records show he did receive email notice, [ECF No. 103-1], and Florenzano now suspects those emails were routed to his email's spam folder. Although this shows Florenzano was identified as a Class Member, the Court still had concerns he was not identified as a Refund Class Member. Specifically, the Court was concerned that, because Florenzano accepted a refund for his Protection Plan premium, his interaction with SquareTrade was not coded as a denial due to the Channel Restriction. The Court asked Defendant to confirm whether or not Florenzano was included in the original 580 Refund Class Members. Defendant confirmed that he was not. [ECF No. 112 at 13].

Defendant appears to accuse Florenzano of staging his complaint to SquareTrade. [ECF No. 103 at 2]. Be that as it may, Florenzano's objection called into question the effectiveness of Defendant's efforts to identify Refund Class Members. Without further instruction from the Court,

Defendant undertook a much more thorough review of its claims system to identify additional Refund Class Members.[12]

Defendant determined Florenzano's claim was given the Denial Reason Code "Troubleshot," rather than "ADP Denial" or "Not Within Terms and Conditions." Thus, his claim was not within the original (roughly) 54,000 claims that were reviewed to identify Refund Class Members. Defendant manually reviewed 10,050 additional Class Member claims with Denial Reason Codes of "Troubleshot." Through this manual review, Defendant identified an additional fifteen claims that were denied because of the Channel Restriction.

Defendant then reviewed Class Member claims coded with the remaining twelve Denial Reason Codes. Depending on the number of claims under a Denial Reason Code, Defendant reviewed either all claims or a random sample of claims. With respect to seven Denial Reason Codes, Defendant's review revealed no Channel Restriction denials.[13] As for the remaining five codes—for which this initial review revealed at least one claim denied due to the Channel Restriction—Defendant manually reviewed every claim. After reviewing roughly 70,000 claims (plus claims from some additional searches), Defendant identified an additional 465 claims that were denied due to the Channel Restriction.

Defendant then reviewed the broader claims database to determine if there were codes other than the Denial Reason Codes that could have been used to identify Channel Restriction denials. Defendant identified two codes it thought could be relevant—"canceled warranty" and, within that set of warranties, a further code for "ineligible item." There were 3,503 warranties sold on

---

[12] Those efforts are described in detail in Defendant's first response (and various declarations attached thereto) to the Court's Order for Additional Information. [ECF Nos. 112; 112-2 to 112-6].

[13] For four of those seven Denial Reason Codes, Defendant reviewed every claim.

Amazon during the Class Period that were marked with those codes and, within that group, 1,471 denied claims. Defendant reviewed each of those denied claims and found 111 of them were denied due to the Channel Restriction.

Finally, Defendant ran keyword searches through the "cancellation description" field for all warranties coded "canceled warranty." The keywords were formulated based on phrases that appeared most commonly in the cancellation description fields of claims denied due to the Channel Restriction: "purchase window"; "channel conflict"; and "invalid." The Channel Restriction denials returned by these searches had already been identified in Defendant's previous searches. Thus, this final search was akin to a quality control exercise.

After deduplication, Defendant determined there are 700 Refund Class Members, roughly 120 more than its initial determination. The Court is satisfied with Defendant's additional review efforts, and it finds Defendant has effectively identified Refund Class Members. Defendant's additional review shows careful consideration of its claims processing systems and a well-balanced, reasonable approach to identifying relevant denied claims. Defendant's initial review of the "ADP Denial" and "Not Within Terms and Conditions" Denial Reason Codes focused on the most likely indicators of Channel Restriction denials. Defendant's additional review adequately probed less likely indicators and thoroughly followed up where appropriate.

One potential weakness in this process was Defendant's decision to only review a sample of claims for some of the Denial Reason Codes. However, the Court finds this decision does not render Defendant's search efforts unreasonable or ineffective. As a threshold matter, this weakness is only applicable to the seven Denial Reason Codes where Defendant's search revealed no Channel Restriction denials. If the initial search of a Denial Reason Code revealed even one Channel Restriction denial, every claim bearing that Denial Reason Code was reviewed. Within

those seven Denial Reason Codes for which Defendant found no Channel Restriction denials, Defendant reviewed all claims for four of the codes. Ultimately, that left only three Denial Reason Codes for which Defendant reviewed only a sample of claims.

For one such code, where the Denial Reason Code was left blank, Defendant reviewed 14% (1,205) of the 8,515 denied claims. In light of the relatively modest number of claims under this Denial Reason Code, the Court finds a review of at least 10% of the claims to be appropriate. The remaining Denial Reason Codes were "Within Exclusion Period" and "Within Manufacturer's Warranty." For these codes, Defendant reviewed 7.4% (1,301) of 17,581 denied claims, and .75% (1,395) of 186,039 denied claims, respectively. The Court is satisfied with these sample sizes because these are not obscure codes. They represent denial reasons the application of which would not generally be ambiguous and that appear to operate independently of the Channel Restriction. For example, a SquareTrade representative should be able to reliably determine whether a claim falls within an exclusionary period, and a claim could be denied for this reason without the representative ever having to consider a conflict with the Channel Restriction. Absent miscoding (accidental or deliberate), it would not appear Channel Restriction denials would be found under these Denial Reason Codes. The codes were thus appropriately subjected to a sample review. It would not be reasonable to require Defendant to review over 200,000 claims bearing these Denial Reason Codes, when the sample review of roughly 2,700 claims suggested a broader review would be fruitless.

In conclusion, the Court finds the proposed method for distributing relief to the class supports a finding that the relief provided under the Settlement is adequate for the purposes of Rule 23(e)(2)(C).

-34-

iii.    Attorney's fees

In the Preliminary Approval Order, the Court found the proposed award of attorney's fees supported a finding that the relief in the Settlement was adequate.  In reaching that conclusion, the Court noted that the $25,000 lump sum payment to class counsel would not be deducted from a finite settlement fund and would therefore not detract from any award to the Class Members.  The Court also found the Percentage Payment was reasonable because the approximate value of that payment (then-estimated at $53,940) plus the lump sum payment totaled approximately $79,000.  That figure was only twenty-two percent of the then-total Settlement Refunds, which would typically be acceptable in the Eighth Circuit in similar types of settlements.  *Cf. Yarrington*, 697 F. Supp. 2d at 1064.

The Court finds no reason to deviate from that analysis and concludes the proposed award of attorney's fees supports a finding that the relief in the Settlement is adequate under Rule 23(e)(2)(C).  However, due to uncertainties over the amount of the Percentage Payment after Defendant identified an additional 120 Refund Class Members, the Court intends to limit the total amount class counsel can recover from the Settlement Refunds.  The Court will address that limitation in more detail when evaluating Plaintiff's application for attorney's fees.

iv.    Side agreements

Finally, under Rule 23(e)(2)(C), the Court must also consider the Settlement against the terms of any side agreements the parties have made in connection with the Settlement.  *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).  The parties have confirmed there are no such agreements.

v.    Conclusion as to the adequacy of the relief provided in the settlement

Considering the four factors in Rule 23(e)(2)(C) together, the Court finds the relief in the Settlement is adequate and thus supports a broader finding that the Settlement is fair, reasonable, and adequate.

b.      Equitable treatment

The Court will next consider whether, under Rule 23(e)(2)(D), the Settlement "treats class members equitably relative to each other."  There is no requirement that all class members in a settlement be treated *equally*.  *See Marshall*, 787 F.3d at 510.  The Eighth Circuit Court of Appeals has advised that "in evaluating the strength of the plaintiffs' case and the potential value, the district court must take into account the interest of the entire class."  *Id.* at 519.  "Thus, it must balance the claims of those with potentially substantial damages to those with potentially minimal or insignificant damages."  *Id.* at 519–20.

The Court finds the Settlement achieves that balance.  It is undeniable that Class Members are not treated equally.  All Class Members will benefit from injunctive relief, most notably Defendant's promise not to enforce the Channel Restriction on Protection Plans purchased during the Class Period.  Further, all Class Members will receive a Settlement Coupon, which provides a benefit (albeit a limited one) regardless of whether a Class Member suffered a tangible injury or is giving up a meritorious legal claim.  In addition to those benefits, Refund Class Members, whose Protection Plan claims were denied due to the Channel Restriction, will receive payments in an amount equal to the purchase price of their Covered Products (less up to fifteen percent).  However, the differences in the benefits bestowed upon Refund Class Members and non-Refund Class Members reflect the differences in their respective injuries and the strength of their respective claims.  Refund Class Members have suffered tangible, ascertainable losses that are greater than the more theoretical losses of non-Refund Class Members.  Refund Class Members are also surrendering claims that are more legally viable than those of non-Refund Class Members, and it is fair that their reward under the Settlement reflect this disparity.

Ultimately, the Court concludes Class Members are treated equitably under the Settlement.

c.    Adequacy of class representatives and arm's-length negotiation

Finally, the Court considers two Rule 23(e)(2) factors concerning the conduct of the attorneys in this matter, namely whether: (1) the class representatives and class counsel have adequately represented the class; and (2) the settlement proposal was negotiated at arm's length. Fed. R. Civ. P. 23(e)(2)(A)–(B).

With respect to Plaintiff's adequacy as class representative, Plaintiff provided information to his counsel that formed the basis of the claims in this case. Specifically, he provided information regarding Defendant's Amazon sales practices and Protection Plans; and he reviewed and consulted with his counsel on the Complaint, other filings in this matter, and the Settlement. *See* [ECF No. 90-2 ¶ 15]. He appears to have actively participated in the conduct of this litigation and the Court finds he has adequately represented the Settlement Class.

As for Plaintiff's counsel, who seek to be appointed as class counsel, they are accomplished litigators with ample experience in class actions and complex litigation. *See* [ECF Nos. 22-5 ¶¶ 8–10; 22-6 ¶¶ 5–8]. They were able to secure a settlement that was very favorable to the Refund Class Members and fair to the Settlement Class overall. Furthermore, they have put the interests of the class over their own. Notably, they did not discuss with Defendant's counsel an award of attorney's fees until after the two sides had agreed on the other substantive terms of the Settlement. [ECF No. 68 ¶ 5]. Furthermore, the proposed award of attorney's fees (initially estimated to be approximately $79,000) is reasonable in light of the total cash compensation to be paid out in the Settlement. The Settlement thus lacks the sort of disproportionate attorney's fees that indicate the primary aim of Plaintiff's counsel was to benefit themselves at the expense of the Class Members.

Objector Hagan argues Plaintiff and Plaintiff's counsel have a fundamental conflict of interest based on the procedural posture of the *Starke* matter. He believes that because Starke

overcame Defendant's motion to compel arbitration in that case, Class Members are in a better position in *Starke* than they are in this matter (the proposed classes in both actions largely overlap). As a result, Hagan argues, Plaintiff and his counsel are motivated to settle this matter to secure the incentive award and attorney's fees, respectively, regardless of the Class Members' interests.

The Court does not agree that the Settlement Class is necessarily in a better position in *Starke* than it is here. Hagan is correct that Starke overcame a motion to compel arbitration. However, although *Starke* is presently stayed pending the outcome of this matter, *see* Order Staying Case, *Starke*, 1:16-cv-07036-NGG-SJB (E.D.N.Y. Sept. 30, 2019), ECF No. 67, there is an outstanding motion to dismiss several of Starke's claims. *See* Def.'s Br. in Support of Mot. to Dismiss, *Starke*, May 24, 2019, ECF No. 65. A class has not been certified in that case. No settlement has been reached. Hagan appears to equate resisting a motion to compel arbitration with securing a settlement that is at least as favorable as the Settlement here. That goes too far. Instead, there remains a real possibility that no class will be certified in *Starke* or, if it is, Defendant will succeed on the merits, and the class will walk away with nothing.

Moreover, according to Hagan, the conflict arises from the incentives of Plaintiff and Plaintiff's counsel to secure a settlement and related awards, even if the settlement is not in the Class Members' interests. But the Court has already determined the relief in the Settlement is adequate and the Class Members are treated equitably. Additionally, as determined above, the proposed award of attorney's fees is modest and well within the acceptable range of reasonable fee awards (as a percentage of payments made under the Settlement). This is simply not a scenario

where Plaintiff's counsel have unduly enriched themselves to the detriment of the Class Members.[14]

Hagan, Florenzano, and amicus Starke each accused the parties in this action of engaging in a reverse auction, an accusation that implicates both the adequacy of Plaintiff's counsel and whether the parties engaged in an arm's length negotiation.   A reverse auction is a "practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002).   There is a collusive element to a reverse auction, often signified by "generous attorneys' fees":

> The ineffectual lawyers are happy to sell out a class they anyway can't do much for in exchange for generous attorneys' fees, and the defendants are happy to pay generous attorneys' fees since all they care about is the bottom line—the sum of the settlement and the attorneys' fees—and not the allocation of money between the two categories of expense.

*Id.*

There are some indications of a reverse auction here—this matter and *Starke* are competing class actions involving the same Defendant, and Defendant opted to enter into a settlement in one action but not the other.   However, this case lacks the qualities of a reverse auction identified in *Reynolds*, namely ineffectual lawyers, generous attorney's fees, and a disproportionate allocation of settlement payments to class counsel.   Instead, Plaintiff's counsel have secured a favorable

---

[14] Relatedly, Hagan argues class counsel are inadequate because they brought this action in the Southern District of Iowa which, in his view, is a less favorable forum that the Eastern District of New York.   This argument is without merit.   The Eighth Circuit Court of Appeals has expressly "decline[d] to accept the invitation to hold that forum shopping in an unsettled area of law is an essential element of adequate representation."   *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1177 (8th Cir. 1995).

settlement for the Class Members, and the requested attorney's fees—again—are modest in and of themselves and not disproportionate to the relief offered in the Settlement.  As the United States Court of Appeals for the Ninth Circuit has observed, there must be some evidence of "underhanded activity."  *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1099 (9th Cir. 2008). Otherwise, "the 'reverse auction argument would lead to the conclusion that no settlement could ever occur in the circumstances of parallel or multiple class actions—none of the competing cases would settle without being accused by another of participating in a collusive reverse auction.'" *Id.* at 1099–1100 (quoting *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1189 (10th Cir. 2002)).  Although the competing class actions and selective settlement potentially signal a reverse auction, the Settlement lacks the indicia of collusion that are the true hallmarks of a reverse auction.

Additionally, Florenzano and Hagan argue the Settlement was rushed, thus also implicating the adequacy of Plaintiff's counsel and whether the parties negotiated at arm's length.  Hagan in particular argues Plaintiff should have continued litigating the case notwithstanding Defendant's settlement offer.  There is no inherent problem with the parties settling this case in its early stages. The Federal Rules do not prescribe a procedural posture after which settlement may be pursued, and the Court will not create a precedent that would graft such a requirement onto Rule 23.  There is no temporal inquiry involved in determining if a settlement is fair, reasonable, and adequate. Furthermore, Hagan's suggestion that Plaintiff proceed in the face of the settlement offer would have been very risky.  At the point the parties began negotiating a settlement, Defendant's Motion to Compel Arbitration was pending.  Perhaps Plaintiff would have defeated that motion and, theoretically, been in a stronger position in later settlement negotiations.  Or perhaps Defendant

would have succeeded, and the case would be over.  Given that risk, Plaintiff and his counsel did not act unreasonably in entertaining Defendant's settlement offer when they did.

Aside from the circumstantial indications of a reverse auction noted above, there is no evidence the parties colluded in reaching the Settlement or that they did not negotiate at arm's length.  Also, even if the Settlement was reached quickly, it was still favorable to the Settlement Class as a whole and provides adequate relief.

It is clear with hindsight, however, that Defendant's initial methodology for identifying Refund Class Members was flawed.  But it is less clear how much responsibility Plaintiff or his counsel should bear for the weaknesses in Defendant's search efforts.  The Court has reviewed the memorandum Defendant's counsel gave Plaintiff's counsel that explained the methodology Defendant used to identify the Refund Class Members (the "Refund Methodology Memorandum").  [ECF No. 112-1].  What is apparent from that memorandum is that, because Plaintiff's counsel had no independent knowledge of Defendant's claims database, they had to rely on Defendant's explanation of that database and some of the assumptions baked into Defendant's methodology for identifying Refund Class Members.  Such reliance was reasonable.[15]  Still, Plaintiff's counsel could have also reasonably required Defendant to run a scaled-down version of the searches it eventually ran to identify additional Refund Class Members.

Although this would have been ideal, the Court cannot conclude this failure alone renders Plaintiff's counsel inadequate class representatives.  Plaintiff's counsel have been eager and determined advocates for the Settlement Class.  The Settlement remains favorable and provides

---

[15] This would not be the case if the lawsuit had reached discovery and Plaintiff's counsel had an opportunity to obtain information relevant to Defendant's claims database and related systems.  However, the case did not reach discovery and, as noted above, nothing in the Federal Rules prohibits parties from reaching a settlement in the early stages of litigation.

adequate relief.  Given the disparity in the parties' respective knowledge of Defendant's systems, Plaintiff's counsel acted reasonably in relying on Defendant's representations and reasoning in the Refund Methodology Memorandum.  This is true even if Plaintiff's counsel did not require Defendant to run quality-control searches of its claims database.

Also, it must not be overlooked that the notice and objection period for the Settlement worked as intended.  Florenzano raised the issue of his inclusion in the Settlement Class, which set the Court and Defendant on a broader inquiry into Defendant's methodology for identifying Refund Class Members.  Objections are not merely for class members to voice displeasure over a proposed settlement.  More usefully, they are also a mechanism to highlight flaws with technical aspects of a settlement, which can then be corrected.  It cannot be the case that an objector's identification of a flaw overlooked by class counsel renders them inadequate *per se*.

To summarize, given all of the circumstances, the Court finds Plaintiff and his counsel have and will adequately represent the Settlement Class.  The Court also finds the Settlement was negotiated at arm's length.

### 3.  Remaining *Van Horn* Factors

The Court turns now to the remaining *Van Horn* Factors, namely, Defendant's financial condition and the amount of opposition to the Settlement.  *See Van Horn*, 840 F.2d at 607.  No one disputes whether Defendant is financially capable of either meeting its obligations under the Settlement or continuing this litigation.  *See Marshall*, 787 F.3d at 512 (finding the defendant's financial condition to be a neutral factor when the defendant was "in good financial standing, which would permit it to adequately pay for its settlement obligations or continue with a spirited defense in the litigation").  Thus, this factor is neutral in the Court's fairness, reasonableness, and adequacy inquiry.

As for the opposition to the Settlement, the Court must consider both the amount of opposition (quantitatively), as well as the substance of objections by the "vocal minority." *In re Wireless*, 396 F.3d at 933. Quantitatively, only 26 objections were filed, and 3,682 Class Members opted out. These objections and opt-outs constitute roughly .0236% of the 15.7 million Class Members who received email notice of the Settlement. This represents an insignificant amount of opposition to the Settlement. *See, e.g.*, *Keil*, 862 F.3d at 698 (describing 14 objections out of 3.5 million class members as "minuscule").

Substantively, objectors consistently criticized the Settlement Coupon. Of the twenty-six objections, all but three of them objected to the Settlement Coupons in some way.[16] The reasons for the objectors' antagonism toward the Settlement Coupons varied. Some argued the coupons are not for a product (i.e., a mobile phone Protection Plan) they would use. *See, e.g.*, [ECF Nos. 78 at 1; 79 at 2; 81 at 1; 82 at 1]. In that vein, many objectors highlighted that they purchased several Protection Plans from Amazon, none of which covered a mobile phone. *See, e.g.*, [ECF Nos. 78 at 1; 83 at 4; 89 at 1]. One objector suggested most individuals who would acquire a protection plan for their mobile phone would have already done so through their wireless carriers. [ECF No. 85 at 3]. Some objectors stated or suggested they do not have or want a mobile phone to protect. *See* [ECF Nos. 86 at 1; 92 at 1]. Objectors also characterized the Settlement Coupon as enriching Defendant by driving additional business to the company. *See, e.g.*, [ECF Nos. 81 at 5; 83 at 2; 87 at 1; 88 at 1]. Some objectors described the Settlement Coupons as "worthless." [ECF Nos. 78 at 1; 93 at 2; 95 at 1].

---

[16] Two other objectors opposed the Settlement because they had positive experiences with SquareTrade and did not think the company did anything wrong. *See* [ECF Nos. 79 at 1; 80 at 1]. The third other objector did not give reasons for objecting. *See* [ECF No. 84].

These objections have merit.  But as the Court has already discussed with respect to the adequacy of relief in the Settlement, although the value of the Settlement Coupons may be low, so is the value of the claims surrendered.  Weighed against the risks and expenses of continuing to litigate this case, and considering the Settlement as a whole, the deficiencies in the Settlement Coupon do not render the Settlement unfair, unreasonable, or inadequate.

Objectors Hagan and Florenzano submitted detailed objections.  [ECF Nos. 93; 99].  The thrust of their objections concerned the lack of value in the Settlement Coupon and the breadth of state-law claims surrendered as part of the Settlement.  The Court has addressed those issues above and need not repeat those analyses here.

In addition, Hagan argues the Court incorrectly ruled against Starke in his Motion to Intervene in this case.  The Court's Order on that motion is before the Eighth Circuit Court of Appeals, which will ultimately decide that issue.  Hagan also posits the Court has acted inappropriately in ruling on the Settlement before that appeal is resolved.  The Court is under no obligation to stay these proceedings pending appeal, and Starke did not seek a stay from either the Court or the Eighth Circuit Court of Appeals.  Hagan also argues Plaintiff's counsel should file a separate motion for attorney's fees.  At the time Hagan filed his objection, Plaintiff had not yet filed his Motion for Attorney's Fees and Incentive Award.  He eventually did, thus mooting this objection.  Relatedly, Hagan argued the record was devoid of evidence that Plaintiff has done anything in this case to justify an incentive award.  The Court will address this argument later in this Order when it analyzes Plaintiff's application for an incentive award.

As discussed above, Florenzano raised concerns over his inclusion in the Settlement Class based on his allegedly not receiving email notice of the Settlement.  The Administrator confirmed Florenzano received email notice, and Florenzano now speculates he missed those emails because

they were routed to his email's spam folder, which he presumably did not check.  Additionally, based on Defendant's identification of an additional 120 Refund Class Members, Florenzano criticized Defendant's initial search for Refund Class Members and the approval by Plaintiff's counsel of the methodology Defendant applied in that process.  As discussed above, Defendant has adequately addressed any concerns over initial flaws in its methodology for identifying Refund Class Members, and the involvement of Plaintiff's counsel in approving the initial search does not make their representation of the Settlement Class inadequate.  Additionally, the Court has considered whether the routing of email notice to Florenzano's spam folder makes distribution of relief under the Settlement ineffective and concluded it does not.  The same reasoning supporting that conclusion supports a finding that the possible routing of email notice to spam folders does not cause notice of the Settlement to be defective.

Florenzano also argued the Court and parties undervalued the state consumer fraud claims that Class Members will surrender as part of the Settlement, and that the parties have not adequately provided information about the value and redemption rate of the Settlement Coupons.  The Court considered these arguments above but ultimately found the surrendered state law claims were of low value and faced substantial litigation risks.  The Court also found the parties submitted sufficient information about the Settlement Coupons to allow the Court to compare their value to the value of surrendered claims for the purposes § 1712(e).

Additionally, Florenzano argued the notices of the Settlement were flawed because they did not expressly state Class Members would give up their right to challenge the Post-Sale Terms and Conditions' arbitration clause in exchange for a "worthless coupon."  [ECF No. 99 at 9].  The Court disagrees.  The long-form Settlement notice expressly states Class Members release all claims related to this action "including . . . any challenge to the Arbitration Provision," that

-45-

Class Members will receive a Settlement Coupon, and it describes the scope and limitations of the coupon. *See* [ECF No. 72 at 6]. This notice was adequate, and neither Rule 23 nor due process require more. Finally, Florenzano also objected to Plaintiff's application for attorney's fees. The Court will address those objections later in this Order when it considers Plaintiff's application for attorney's fees.

Ultimately, the Court has considered the amount of objection to the Settlement, along with the substance of those objections, and finds that the Settlement still warrants approval.

### 4. Conclusion on settlement approval

For the reasons set out above, the Court finds the Settlement is fair, reasonable, and adequate. The Court therefore approves the Settlement under Rule 23(e)(2).

### B. *Class Certification and Notice*

In the Preliminary Approval Order, the Court found it would likely be able to certify the Settlement Class under Rule 23 for the purposes of judgment on the Settlement. [ECF No. 73 at 33]. The Court reached this conclusion after carefully analyzing the relevant factors under Rules 23(a) and (b)(3). *See id.* at 21–30. However, the Court's findings as to the likelihood of class certification did not amount to a preliminary or conditional class certification. "The ultimate decision to certify the class for purposes of settlement cannot be made until the hearing on final approval of the proposed settlement." Rule 23 Advisory Committee Notes.

Having held the final approval/fairness hearing, the Court finds no reason to deviate from the class certification analysis set out in the Preliminary Approval Order. The Court thus fully incorporates that analysis here by reference. Also, for the purposes of Rule 23(a)(4)'s requirement that the representative parties will fairly and adequately protect the interests of the class, the Court incorporates its analysis above with respect to Rule 23(e)(2)(A), whereby the Court found Plaintiff

and his counsel have adequately represented the class. Based on these incorporated analyses, the Court certifies the Settlement Class under Rule 23 for the purposes of judgment on the Settlement.

Similarly, in the Preliminary Approval Order, the Court analyzed the proposed method of distributing notice of the Settlement to the Settlement Class. After reviewing the various notices and the methods by which the parties planned to distribute them, the Court concluded the notice plan satisfied both the requirements of Rule 23(c)(2)(B) and the due process requirements of the United States Constitution. [ECF No. 73 at 31–32]. The Court fully incorporates that analysis here by reference. Additionally, in the Preliminary Approval Order, the Court asked the parties to provide the Court with the number of undeliverable notifications the Administrator received in response to the email notice. Earlier in this Order, the Court discussed how these 1.1 million bounce-back messages did not make the method of distributing relief under the Settlement ineffective. That analysis applies equally to the appropriateness of the notice plan, and it, too, is incorporated by reference. As discussed above, the parties' reliance on predominantly electronic notice was reasonable in light of the nature of Defendant's business and its interaction with its customers. Further, the use of banner ads was an adequate supplement to the email notice and led to many Class Members providing class counsel with updated contact information via the Settlement Website. In sum, the Court reiterates its finding in the Preliminary Approval Order that the notice plan satisfies the requirements of Rule 23 and constitutional due process.

## C. *Appointing Class Counsel*

Having formally certified the class under Rule 23, the Court "must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing class counsel, the Court:

>    (A)   must consider:
>
>        (i)   the work counsel has done in identifying or investigating potential claims in the action;

      (ii)   counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

      (iii)  counsel's knowledge of the applicable law; and

      (iv)  the resources that counsel will commit to representing the class;

(B)   may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(C)   may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D)   may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

(E)   may make further orders in connection with the appointment.

*Id.*

Having considered the relevant factors under Rule 23(g)(1), the Court finds it appropriate to appoint Erbe and Wandro as class counsel. Their work in identifying or investigating the claims in this action is the weakest of the Rule 23(g)(1) elements as applied to them. According to Erbe's billing statement submitted in support of Plaintiff's application for attorney's fees, his work preparing for this action included a review of filings in *Starke*, which would have given him an overview of the legal basis and pertinent facts supporting Plaintiff's MMWA claim. Nevertheless, his billing statement shows he conducted independent research on MMWA claims and Defendant's sales practices. The declarations of Erbe and Wandro also show they met with Plaintiff and discussed his experience as Defendant's customer, along with Defendant's Amazon sales practices generally.

As to the other mandatory factors under Rule 23(g)(1)(A), Erbe and Wandro are both accomplished litigators with broad experience in class actions and complex litigation. Although

their affidavits do not indicate experience in MMWA cases, they have demonstrated their knowledge of the applicable law throughout this litigation, including, most recently, with respect to the consumer fraud claims potentially available to some Class Members. In terms of resources, counsel have already expended a good deal of time on this matter, especially considering when in the course of litigation this matter settled, and they will continue to serve the Settlement Class throughout the administration of the Settlement.

Rule 23(g)(1)(B) permits the Court to consider other matters pertinent to counsel's ability to fairly and adequately represent the class. To this end, and as discussed above, there are no known conflicts of interest that would cause Plaintiff's counsel to be inadequate. Further, Plaintiff's counsel secured a favorable settlement in this case. Their success is relevant and supports a finding that they will be able to adequately represent the Settlement Class.

For these reasons, the Court appoints Erbe and Wandro as class counsel under Rule 23(g). Throughout the rest of this Order, Plaintiff's counsel will be referred to as "Class Counsel."

### D. *Attorney's Fees*

#### 1. Request and applicable law

Rule 23(h) provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or the parties' agreement." Fed. R. Civ. P. 23(h). Plaintiff moves for an award of attorney's fees in the amount of $25,000, plus a Percentage Payment of up to fifteen percent of Settlement Refunds. At the time Plaintiff filed his Motion for Attorney's Fees and Incentive Payment, the parties estimated there were approximately 580 Refund Class Members, and the average purchase price of their Covered Products was $620. Based on that average, the Percentage Payment would total approximately $53,940.

The Percentage Payment will be higher now because Defendant has identified 120 additional Refund Class Members. That presents a problem for the Court in assessing Plaintiff's application for attorney's fees. There is no evidence in the record as to the purchase price of these additional Refund Class Members' Covered Products.[17] If the Court knew the maximum total payment Class Counsel stood to receive under the Settlement, the Court could evaluate the reasonableness of the attorney's fees based on that outside figure. But the Court does not have that figure and will not speculate as to what it might be.

Thus, the Court considers the total amount of proposed attorney's fees to be $78,940 (the $25,000 lump sum payment plus the capped Percentage Payment of $53,940). If the Court grants the application for attorney's fees, the Percentage Payment will be limited to $53,940, and the actual percentage deducted from the Settlement Refunds shall be reduced so that the Percentage Payment is collected in an equal percentage from all 700 Refund Class Members.[18]

Turning to the applicable law, the MMWA contains a fee provision, which states:

> If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost

[17] The additional Percentage Payment is potentially significant. For example, if the average purchase price of Refund Class Members' Covered Products remains $620, that results in a Percentage Payment of $65,100, roughly $11,000 more than that based on the originally identified Refund Class Members.

[18] Florenzano argues Class Counsel should not be compensated for the additional 120 Refund Class Members because their identification was a direct result of his objection and not the efforts of Class Counsel. The Court has denied any additional Percentage Payment award for these Refund Class Members on account of a lack of evidence in the record, thus mooting this objection. Florenzano also argues that whatever additional payment Class Counsel earn from these additional 120 Refund Class Members should in fact go to his counsel. In a footnote at the end of this apparent request, Florenzano added, "[a]s it is Mr. Florenzano's position that the Settlement should be rejected, it would not be appropriate for his counsel to move for a fee at this time." [ECF No. 113 at 12 n.10]. Because this is—by Florenzano's admission—not a motion, it is not a request to the Court, and the Court will not consider it. *See* LR 7(a). To the extent this is a further objection, it is also moot in light of the Court limiting the Percentage Payment.

and expenses (including attorneys' fees based on actual time
expended) determined by the court to have been reasonably incurred
by the plaintiff for or in connection with the commencement and
prosecution of such action, unless the court in its discretion shall
determine that such an award of attorneys' fees would be
inappropriate.

15 U.S.C. § 2310(d)(2). The United States Court of Appeals for the Seventh Circuit has voiced

skepticism that § 2310(d)(2) applies to settled MMWA disputes, noting that attorney's fees

included as part of a settlement are not necessarily paid as "part of the *judgment*," and there is no

evidence in the MMWA's statutory history that Congress intended to apply the MMWA's

fee-shifting provision to "settlement cases of any kind." *Skelton v. Gen. Motors Corp.*,

860 F.2d 250, 256 (7th Cir. 1988). Nevertheless, district courts have applied § 2310(d)(2) when

determining the appropriateness of attorney's fees in settled MMWA class actions. *See, e.g.*, *Leary*

*v. McGowen Enters., Inc.*, Civil Action No. 17-2070, 2018 WL 4961593, at *5 (E.D. Pa.

Oct. 15, 2018).

District courts in the Eighth Circuit have discretion to use either of two approaches when

assessing the reasonableness of a proposed fee award in a class action settlement: (1) the "lodestar"

method, which looks at the hours expended by an attorney multiplied by a reasonable hourly rate

of compensation, *In re Target Corp.*, 892 F.3d at 977; and (2) the "percentage of the benefit"

method, which allows for an award that is a percentage of a common settlement fund,

*Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 244–45 (8th Cir. 1996). The Settlement does

not strictly create a common fund because the Settlement Refunds are not distributed

proportionally out of fixed amount of money set aside for relief under the Settlement.

Also, § 2310(d)(2)'s language that the fee award must be "based on actual time expended"

indicates that only the lodestar method is applicable to fee awards under the MMWA. As noted

above, it is not clear § 2310(d)(2) applies to this case, but given the Court's discretion to apply

either the lodestar or percentage-of-the-fund methodologies when analyzing Plaintiff's application

for attorney's fees, the Court will err on the side of caution and apply the lodestar method.

Ultimately, "[t]he amount of fees awarded must be reasonable." *Johnson, Tr. of Operating*

*Eng'rs Local #49 Health and Welfare Fund v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510,

526 (8th Cir. 2020). The "lodestar amount"—i.e., the number of hours reasonably expended on a

case multiplied by the reasonable hourly rates for the attorneys who expended those hours—is a

presumptively reasonable fee. *Hashw*, 182 F. Supp. 3d at 949. However, the lodestar amount "can

be adjusted, up or down, to reflect the individualized characteristics of a given action." *Johnston*,

83 F.3d at 244. To determine the ultimate reasonableness of the award, the Court must "consider[]

relevant factors from the twelve factors listed in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d

714, 719–20 (5th Cir. 1974)." *In re Target Corp.*, 892 F.3d at 977 (citing *Keil*, 862 F.3d at 701).

Those factors are:

> (1) the time and labor required, (2) the novelty and difficulty of the
> question, (3) the skill requisite to perform the legal services
> properly, (4) the preclusion of other employment due to acceptance
> of the case, (5) the customary fee, (6) whether the fee is fixed or
> contingent, (7) time limitations imposed by the client or the
> circumstances, (8) the amount involved and the results obtained,
> (9) the experience, reputation and ability of the attorneys, (10) the
> undesirability of the case, (11) the nature and length of the
> professional relationship with the client and (12) awards in similar
> cases.

*Zoll v. E. Allamakee Cmty. Sch. Dist.*, 588 F.2d 246, 252 n. 11 (8th Cir. 1978) (citing *Johnson*,

488 F.2d at 717–19). Not every *Johnson* factor will be relevant to a given case; thus "the court

has wide discretion as to which factors to apply and the relative weight to assign to each." *In re*

*Xcel Energy, Inc., Secs., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 993 (D. Minn. 2005).

The Court begins by determining the lodestar amount applicable to Plaintiff's application

for attorney's fees. Class Counsel submitted billing statements showing the tasks they completed

on this matter, as well as the amount of time expended on, and the rate and/or total amount charged

for, such tasks.  "When determining reasonable hourly rates, district courts may rely on their own

experience and knowledge of prevailing market rates."  *Brewington v. Keener*, 902 F.3d 796, 805

(8th Cir. 2018) (citation omitted).  "There is no precise rule or formula for making these

determinations.  The district court may attempt to identify specific hours that should be eliminated,

or it may simply reduce the award to account for . . . limited success."  *Id.* (quoting *Hensley v.

Eckerhart*, 461 U.S. 424, 436–37 (1983)).

On a straight hourly fee basis without multipliers or enhancers, Class Counsel's total fees

submitted in support of the fee award are $54,635.  [ECF Nos. 90-2; 90-5].  The Court finds both

the rates applied and tasks billed to be reasonable.  The rates range from $300 per hour for Wandro,

to $200 for one of his associates.  These rates are generally consistent with (and in some cases

lower than) rates charged for metropolitan attorneys in Iowa.  *See, e.g.*, Ronald L. Burdge, Esq.,

*United States Consumer Law Attorney Fee Survey Report 2015–2016*, 72–73, 237–38 (2017),

https://www.nclc.org/images/pdf/litigation/tools/atty-fee-survey-2015-2016.pdf    (last    visited

Apr. 14, 2020).   Further, the Court finds the tasks completed were neither repetitious nor

unnecessary, and no tasks took an unreasonable amount of time to complete.  Class Counsel also

appear to have been conservative in identifying the work on which they base the fee application.

For example, Wandro's affidavit details his involvement in commencing this action in April 2018.

[ECF No. 90-3 ¶ 18].  Yet, the earliest work on his firm's billing statement is dated August 3, 2018.

[ECF No. 90-5 at 1].  This does not detract from the reliability of the materials submitted; rather,

it suggests Class Counsel limited their billing statements to ensure the reasonableness of the fee award.[19]

Florenzano argues Class Counsel should not be compensated for time they spent resisting Starke's involvement in this matter because said involvement resulted in various improvements to the Settlement.  [ECF No. 99 at 11].  The Court views this argument with skepticism.  Florenzano is represented by, among others, Bradley Nash, Chet Waldman, and Matthew Tucker Insley Pruitt, three of the attorneys representing Starke in this matter.  [ECF Nos. 33 at 6–7; 99 at 12].  Florenzano, or at the very least his lawyers, should know Starke sought intervention so he could transfer this case to the Eastern District of New York.  Had he succeeded, it would have ended the case and there would be no Settlement.  As advocates for the Settlement Class seeking approval of a fair, reasonable, and adequate settlement, Class Counsel would be expected to vigorously oppose such an effort.  Furthermore, in his capacity as amicus, Starke was effectively an objector.  Some of his objections were well-taken; others were not.  But class counsel are expected to counter objectors' arguments in order to ensure approval of a settlement.  Class Counsel here should not be penalized for executing their fiduciary duties to the Settlement Class.

The Court concludes the lodestar amount applicable to Class Counsel's fee application is $54,635.  However, Class Counsel seek approximately $79,000.  This represents a multiplier of less than two.  Assuming such an increase is warranted under the *Johnson* factors, a multiplier of two is well within the range of multipliers awarded in the Eighth Circuit.  *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 866 (8th Cir. 2017).  Multipliers are also acceptable in cases involving statutory fee awards, such as those under MMWA.  *See Skelton*, 860 F.2d at 256–57.  However, in

---

[19] The Court has no reason to doubt Wandro's representations to the Court in his affidavit. He was clearly involved in the case in early 2018, as demonstrated by his co-filing the Complaint in state court on April 19, 2018.  [ECF No. 1-1 at 23].

such cases, "no enhancement for risk is appropriate unless the applicant can establish that without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 733 (1987) (O'Connor, J., concurring in part and concurring in the judgment) (quoting the plurality opinion, 483 U.S. at 731).[20]   "'[L]egal' risks or risks peculiar to the case" are not sufficient to warrant an enhancement of the lodestar because those factors will typically be "reflected in the number of billable hours recorded by counsel." *Id.* at 734 (citation omitted).   Rather, "compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class*, rather than on an assessment of the 'riskiness' of any particular case." *Id.* at 731.[21]   Thus, to determine if a $79,000 fee award is reasonable in this case, the Court must analyze the relevant *Johnson* factors as well as whether Plaintiff would have faced substantial difficulties securing counsel without an enhancement for risk.

### 2.   *Johnson* factors and necessity of a risk enhancement

Turning to the *Johnson* factors, Class Counsel concede the fourth and seventh factors—the attorney's opportunity costs in pressing the instant litigation and the time limitations imposed by the client or other circumstances—are not applicable here.   The Court accepts this concession.

Many of the *Johnson* factors are related to one another and lend themselves to being analyzed in tandem.   Such is the case for the first three *Jonson* factors: (1) the time and labor

---

[20] Justice O'Connor agreed with part of the reasoning of the four-vote plurality and with some of the arguments offered by the four-vote dissent.   Her position on risk multipliers thus represents the position of a majority of the Court.

[21] The United States Supreme Court reiterated these principles in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552–53 (2010).   That case concerned whether a court could award a lodestar multiplier under a statutory fee provision based on an attorney's superior performance and results.   *Id.* at 546.   Class Counsel do not argue they are entitled to a lodestar multiplier for such reasons, and so *Perdue* is of limited relevance in this case.

required; (2) the novelty and difficulty of the issues in the case; and (3) the skill requisite to perform

the legal services properly.  Class Counsel spent at least 220 hours on work related to this matter.

As noted above, that work, and the time expended on it, was reasonable.  Further, although the

parties agreed to a settlement early on in the litigation, this was not an easy case.  Roughly a week

after removing this matter to federal court, Defendant filed its Motion to Compel Arbitration.

*See* [ECF Nos. 1; 8].  Class Counsel spent approximately forty hours conducting legal research

and drafting a resistance to that motion before the parties began settlement discussions.  *See* [ECF

No. 90-2 at 6].  Class Counsel then had to resist Starke's Motion to Intervene and prepare briefing

and argument for his appeal of the Court's Order denying that motion.  The Court also closely

scrutinized the Settlement and requested additional information from the parties on multiple

occasions.

As a matter of substance, this case has presented novel and difficult issues, including the

application of the arbitration clause in the Post-Sale Terms and Conditions, the accusations of a

reverse auction, and the adequacy of the Settlement relief (in particular, that of the Settlement

Coupons).  Class actions are not easy cases.  It takes lawyers of great skill to navigate the

procedural and substantive hurdles inherent in them and, should such a matter settle, arrive at a

settlement that is fair to the class as a whole.  This case is no different, and Class Counsel have

demonstrated the requisite skill in handling this matter.

Turning to the customary fee and whether the fees in this case are fixed or contingent,

Class Counsel submit that "[a] one-third contingency fee is the standard contingency arrangement

that [they] reach with their clients in individual plaintiff matters."  [ECF No. 90-1 at 9].  They also

state that they "accepted this case on a contingent fee basis, with the understanding that if they

prevailed at trial, the Court would consider an award of fees and expenses pursuant to the

MMWA." *Id.* at 10. The Court has no reason to doubt these assertions. It is therefore notable that the amount of attorney's fees emanating from Class Members (as opposed to Defendant) is less than fifteen percent of the Settlement Refunds. That percentage is much lower than the typical one-third contingency fee. Adding in the additional $25,000 to be paid by Defendant, the roughly $79,000 in attorney's fees is less than twenty-two percent of those Settlement Refunds, also much lower than the typical one-third contingency fee.[22] The Court finds these factors support the reasonableness of the proposed fee award in this case.

These fee-based factors are related to the tenth *Johnson* factor: the undesirability of the case. In cases, such as here, where an individual's damages may be relatively modest, plaintiffs may be unwilling (or unable) to pay attorney's fees and costs in advance. Thus, were it not for statutory provisions allowing for awards of attorney's fees and costs to prevailing parties, and attorneys willing to assume representation on a contingent fee basis because of those provisions, it would be difficult for a plaintiff to obtain legal representation in such matters. Consequently, public policy favors adequate fee awards in cases involving fee-shifting statutes so as to encourage aggrieved plaintiffs to bring such actions and to provide incentives for counsel to take them on a contingent fee basis. *Cf. Chavarria v. N.Y. Airport Serv., LLC*, 875 F. Supp. 2d 164, 177–78 (E.D.N.Y. 2012) (discussing policy motivations for statutory awards of attorney's fees in wage and hour cases). Like with the previous factors discussed, this factor supports the reasonableness of the proposed fee award.

The eighth *Johnson* factor, the amount involved and the results obtained, also supports the reasonableness of the proposed fee award. The amount in controversy in this case was at least

---

[22] The percentage figures in this paragraph take into account the Court's requirement that the total Percentage Payment of $53,940 be taken in an equal percentage from each of the 700 Refund Class Members.

$359,600 (the approximate sum of the Settlement Refunds for the original Refund Class Members). This is a relatively modest sum, but so is the proposed fee award. And Class Counsel have achieved positive results in this litigation. The Court already discussed above the various obstacles facing Plaintiff and the Settlement Class should this matter have proceeded to trial. The outcome of further litigation is far from certain, and the Settlement provides immediate benefits to the class without the delay, difficulties, and expense of further litigation. The Settlement ensures Class Members will receive relief that is fair, reasonable, adequate, and compensates Class Members in proportion to the severity of their injuries and strength of their claims.

The Court next considers the experience, reputation, and ability of class counsel. Class Counsel have considerable experience in complex litigation and class action lawsuits. They are highly regarded attorneys in the local legal community, and the results in this case speak to their abilities. This case presented numerous challenges, and Class Counsel were able to secure a fair, reasonable, and adequate settlement for the Settlement Class. This factor thus supports a finding that the proposed fee award is reasonable.

That leaves the Court with two remaining *Johnson* factors: the nature and length of the professional relationship between lawyers and client, and fee awards in similar cases. Plaintiff is a local attorney and a former member of Wandro & Associates, PC. Class Counsel have represented him for nearly two years in this case, and he appears to have been actively involved in this matter. He provided Class Counsel with information regarding Defendant's Amazon sales practices and Protection Plans; and he reviewed and consulted with Class Counsel on the Complaint, other filings in this matter, and the Settlement. This shows he and his attorneys have had a positive, cooperative professional relationship.

As for the fee awards in similar case, as noted above, lodestar multipliers under two are commonly approved in the Eighth Circuit. *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 866 (8th Cir. 2017). Here, Class Counsel seek a lodestar amount with a multiplier of only approximately 1.46. As to Class Counsel's recovery as a percentage of relief distributed to the Settlement Class, "[e]mpirical data on fee awards demonstrate that percentage awards in class actions are generally between 20–30% [of the recovery], with the average award hovering around 25%." 5 Newberg on Class Actions § 15:83 (5th ed. 2011) (footnote omitted). The roughly $79,000 in proposed attorney's fees are no more than 22% of the Settlement Refunds, which is within the general range of percentage awards in class action settlements. The Court thus finds this factor favors approval of the proposed fee award.

The ten applicable *Johnson* factors suggest the proposed fee award is reasonable in this case. However, assuming § 2310(d)(2) applies, the Court cannot award a fee based on a multiplier unless the Court finds that "without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" *Del. Valley*, 483 U.S. at 731 (O'Connor, J., concurring in part and concurring in the judgment) (citation omitted).

The individual value of claims in this case is low. For individuals whose Protection Plan claims were denied due to the Channel Restriction, their damages are arguably the purchase price of their Covered Product. Given that the purchase price of such products averaged $620 for the originally identified 580 Refund Class Members, claims would generally be valued no higher three or four figures. It is unlikely any plaintiff would hire counsel for such a claim on the basis of a guaranteed flat fee or a non-contingent hourly fee. The costs of attorney's fees under those arrangements would far surpass any potential recovery.

From the attorney's point of view, there is not enough at stake in any individual low-value claim to interest a lawyer to consider a contingency fee based on a percentage of the recovery, or a straight hourly fee without a multiplier.  For example, Erbe spent fifty-three hours working on this matter before the parties entered into settlement discussions, earning $13,250 in fees. *See* [ECF No. 90-2 at 6].  That work covered only the very early stages of this litigation—initial discussions with the client, drafting and filing the Complaint, and preparing a resistance to Defendant's Motion to Compel Arbitration.  *See id.*  If a $1,000 claim resulted in a favorable judgment for a plaintiff Class Member, a one-third percentage award of the recovery would only be $333, or 2.5% of the Erbe's earned fees *before* discovery.

Although an award of an hourly fee without a multiplier would compensate attorneys at a reasonable rate for their reasonable work on this matter, the risk involved is prohibitive. Class Counsel agreed to handle this case on a contingency fee basis and advanced all costs and expenses necessary for its prosecution.  The contingency nature of the fee arrangement puts a substantial risk of loss on Class Counsel because they are not paid and do not recover their expenses unless they are successful in obtaining a recovery on behalf of the class members.  That risk increases exponentially as the matter progresses.  That can be seen in this case.  Class Counsel earned at least $13,000 in the first four months of the case (including work done before filing the Complaint).  That work did not include further briefing or argument on the Motion to Compel Arbitration; resistance to any 12(b) motion; discovery; class certification; summary judgment; pre-trial motions; trial; or appeal.

This is not an assessment of the legal risks or challenges of this particular case.  Rather, there is always a risk in a contingency fee matter that the case will last a significant amount of time and generate large earned fees that plaintiff's counsel risks never recovering.  A plaintiff with a

low-value claim will have extraordinary difficulty securing representation in such a case.  An award of hourly fees with a modifier—a sort of risk premium—helps to incentivize attorneys to take such cases by bringing the risks and rewards in closer proportion to one another.  The Court thus concludes that applying a multiplier (i.e., a risk modifier) to a fee award based on the lodestar method is necessary to ensure Plaintiff could secure counsel in this case.

### 3.  Conclusion as to attorney's fees

For the foregoing reasons, the Court GRANTS Plaintiff's application for attorney's fees. Defendant shall pay Class Counsel $25,000, and Class Counsel may recover a percentage of each Refund Class Member's Settlement Refund.  The percentage recovered must be the same for each Refund Class Member, and the sum of such payments shall not exceed $53,940.

### E.  *Service Awards to Class Representative*

Finally, as class representative, Plaintiff seeks an incentive award of $2,500, to be paid by Defendant.  [ECF No. 22-1 at 14].  Relevant factors to be considered when deciding whether an incentive award is warranted include the actions a plaintiff took to protect the class's interests, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing litigation, and whether the incentive award will diminish the recovery of other class members.  *In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002); *Jones v. Casey's Gen. Stores*, 266 F.R.D. 222, 231 (S.D. Iowa 2009).

Here, Plaintiff provided the initial information and documents that were the genesis of the underlying claims in this lawsuit, reviewed and approved the Complaint, met and corresponded on a regular basis with Class Counsel, reviewed and consulted on Defendant's Motion To Compel Arbitration (including a declaration that was not filed because the parties initiated settlement discussions), and reviewed and consulted on Defendant's settlement offers and arguments.  [ECF No. 90-2 ¶ 15].  This case settled in the early stages of litigation, so Plaintiff did not have an

opportunity to participate in discovery or trial. However, the Court finds the early settlement is reflected in the modest value of the incentive payment sought. Additionally, the Court finds Plaintiff's efforts resulted in a settlement that was fair, reasonable, and adequate to the Settlement Class. Because Defendant has agreed to pay the incentive award separate from other relief, the award will not detract from compensation to other Class Members.

Hagan objects to the proposed incentive payment on the grounds that there is no evidence justifying an incentive award. He argues that "[i]ncentive awards typically exist to promote people to serve as class representatives and to embrace an active role in their cases." [ECF No. 93 at 7]. At the time Hagan filed his objection, Plaintiff had not yet submitted his Motion for Attorney's Fees and Incentive Award. The declarations attached to that motion contain evidence of Plaintiff's involvement in this matter.

Hagan's argument against an incentive award is premised on the idea that, because *Starke* was already underway at the time this action was commenced, there was no need to incentivize Plaintiff to bring this action. But in the Eighth Circuit, the determination of whether or not to grant an incentive award is based on the effort expended by the plaintiff and not the necessity of the case. *See, e.g.*, *In re U.S. Bancorp Litig.*, 291 F.3d at 1038 (identifying actions plaintiff took to protect the class's interests, degree to which the class has benefited from those actions, and the amount of time and effort expended in pursuing litigation to be relevant factors in an incentive award analysis); *Meller v. Bank of the West*, No. 3:18-cv-00033-JAJ-SBJ, 2018 WL 5305562, at *8 (S.D. Iowa, Sept. 10, 2018) (same); *Huyer v. Wells Fargo & Co.*, 314 F.R.D. 621, 629 (S.D. Iowa 2016) (approving $10,000 incentive award for each plaintiff after finding they "were deposed, participated in discovery, and maintained contact with class counsel over the course of this multi-year litigation"); *Jones*, 266 F.R.D. at 231 (approving an incentive award after finding

the "[p]laintiffs took substantial action to step forward and pursue the present litigation"). As discussed above, Plaintiff was actively involved in this litigation, including its settlement, and his participation in this case was adequate to warrant the modest incentive award he seeks.

Accordingly, the Court approves an incentive award to Plaintiff in the amount of $2,500.

### III.  CONCLUSION

For the foregoing reasons:

1. This and the following paragraphs incorporate by reference the definitions in the Settlement Agreement, and all terms in said paragraphs shall have the same meaning as set forth in the Settlement Agreement unless otherwise indicated.  For the purposes of this paragraph and the paragraphs that follow, if the definitions in the Settlement Agreement conflict with the defined terms in this Order, the definitions in the Settlement Agreement shall apply.

2. The Court has jurisdiction over the subject matter of the Action and over all Parties to the Action, including all Settlement Class Members.

3. This Court hereby approves the Settlement Agreement and finds the Settlement is, in all respects, fair, reasonable, adequate, and in the bests interest of the Settlement Class. The Parties are hereby directed to consummate, carry out, or complete the provisions of the Settlement Agreement in accordance with its terms, as modified by any Orders of the Court.

4. The Court hereby certifies the Settlement Class under Federal Rule of Civil Procedure 23.  The Court appoints Plaintiff as class representative, and appoints Harley Erbe and Steven Wandro as Lead Class Counsel.

5. The Action is hereby dismissed as to Defendant on the merits with prejudice and without costs (except as otherwise provided for in the Settlement Agreement), and Plaintiff and each of the Settlement Class Members, on the Effective Date, shall be deemed to have, and by operation of this Order shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the Released Parties; provided, however, that the Releases shall not include the right to, or any claim or action brought to, enforce the Settlement Agreement or any claim for breach of the Settlement Agreement.

6. As of the Effective Date, all Settlement Class Members are hereby forever barred and enjoined from prosecuting the Released Claims against the Released Parties.

7. The Notices to the Settlement Class described in Section II(C) of the Settlement Agreement, as modified by any Orders of the Court, constituted the best notice practicable under the circumstances, including the individual notice to all Settlement

Class Members who could be identified through reasonable effort. The Notice provided pursuant to the Settlement Agreement fully satisfied the requirements of the Federal Rules of Civil Procedure and the requirements of due process. A full opportunity has been offered to the Settlement Class Members to object to the proposed Settlement Agreement and to participate in the hearing thereon. Thus, it is hereby determined that all Settlement Class Members are bound by this Order except those persons who excluded themselves from the Class, whose identities are set forth in Exhibit A hereto.

8. Neither the Settlement Agreement, nor any act performed or document executed pursuant to or in furtherance of the Settlement Agreement: (i) is or may be deemed to be or may be used as an admission of, or evidence of, the validity or lack thereof of any Released Claim, or of any wrongdoing or liability of the Defendant or Released Parties, or Plaintiff or Lead Class Counsel; or (ii) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any Defendant or Released Party or Plaintiff or Lead Class Counsel, including in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. Defendant and the other Released Parties or Plaintiff or Lead Class Counsel may file the Settlement Agreement and/or this Order in any action against them to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim, or as may be necessary to enforce the terms of the Settlement Agreement and Court Orders and Judgment entered in connection with the approval of the Settlement Agreement.

9. The Court reserves exclusive and continuing jurisdiction to implement, enforce, administer, effectuate, interpret, monitor, and ensure compliance with the provisions of the Settlement Agreement and this Order.

10. The Clerk of Court is DIRECTED to issue Judgment in accordance with this Order and close this matter.

IT IS SO ORDERED.

Dated this 14th day of April, 2020.

_____
STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT